**SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, CLC; et al., Plaintiffs,**

v.

**FAIR POLITICAL PRACTICES COMMISSION, et al., Defendants.**

**California Democratic Party, Plaintiff–Intervenor,**

and

**Quentin L. Kopp and Ross Johnson, Defendants–Intervenors.**

**No. CIV. S–89–433 LKK.**

United States District Court, E.D. California.

Sept. 26, 1990.

Joseph Remcho, Remcho, Johansen & Purcell, San Francisco, Cal., for plaintiffs.

Joseph Garcia, Scott Hallabrin, Fair Political Practices Com'n, Sacramento, Cal., for defendants.

Robert E. Darby, Calvin House, Fulbright & Jaworski, Los Angeles, Cal., for plaintiffs in intervention.

Quentin L. Kopp, Kopp & Di Franco, San Francisco, Cal., James Ross Johnson, Sacramento, Cal., for defendants in intervention.

John Mueller, Nielsen, Merksamer, Hodgson, Parrinello & Mueller, Mill Valley, Cal., for amicus California Republican Party.

## SECOND AMENDED CONCLUSIONS OF LAW

KARLTON, District Judge.

In this lawsuit, the original plaintiffs, a number of elected state officials, various campaign committees, labor organizations, and a contributor to political campaigns (sometimes hereinafter referred to as "the plaintiffs"), and the plaintiffs in intervention, the Democratic Party (hereinafter referred to as "the Democratic Party" or "the Party"), challenge certain provisions of an initiative adopted by the people of the State of California, known as Proposition 73. After trial, the court took the matter under submission.

The court has agreed to make findings as to all issues of fact which any party believes may be required to ultimately dispose of this matter. The court has set them out in a separate document entitled "Findings of Fact" because it consists of 208 discrete findings. Below, the court articulates its disposition of the case, and

will advert to various of those findings as required by this opinion.

I begin with a description of the salient provisions of Proposition 73 as they pertain to this litigation.

## I

### THE STATUTORY SCHEME

Proposition 73 amended the existing California Political Reform Act by adding a new Chapter 5 to Title 9 of the California Government Code.[1] The proposition applies to all campaigns for election to state or local office. See sections 82007, 82023, 82024. Although section 91005 of the Government Code imposes civil liability for violation of Proposition 73, the statute also makes criminal the knowing or willful violation of its provisions. Section 91000.

Proposition 73 seeks to regulate state elections in a variety of ways. First, it establishes limitations on campaign contributions that may be made or accepted during any fiscal year, defined as the period between July 1 and June 30. Section 85102(a). Under its provisions:

1. A "person"[2] may contribute up to $1,000 to a candidate (including all of that candidate's controlled committees) each fiscal year, section 85301(a).

2. A "political committee"[3] many contribute up to $2,500 each fiscal year. Section 85303(a).

3. A "broad-based political committee"[4] or political party may contribute up to $5,000 each fiscal year. Section 85303(b).

The measure also limits to $2,500 per fiscal year contributions from a "person" to a political committee, broad-based political committee, or political party for the

purpose of the entities contributing to candidates. Section 85302.

The same contribution limits noted above apply to "special elections." See section 85305(c). The special election limits are imposed for each special election cycle. See sections 85305(a) & (b). A special election cycle is defined as the period beginning with the day a vacancy in office is announced, and ending the day of the special election. Section 85305(b)(1). Proposition 73 provides for the possibility of a runoff in a special election by applying the same limits to a "special runoff election cycle." Sections 85305(b)(2), (c). Contributions permitted during a special election cycle are separate from and in addition to any contribution made during the fiscal year. Accordingly, although the normal fiscal year limit is $1,000, a person can actually contribute up to $3,000 to a candidate in a fiscal year, if the candidate is engaged in a special election and runoff.

The initiative also limits candidates to raising funds for particular offices. It provides that a candidate, before soliciting or receiving contributions, must file with the Fair Political Practices Commission "a statement signed under the penalty of perjury of intention to be a candidate for a specific office." Section 85200. Upon filing the statement, the candidate must establish a single campaign bank account, section 85201(a), and all contributions must be deposited therein and "shall be deemed to be held in trust for expenses associated with the election of the candidate to the specific office" sought. Section 85202(b).

Finally, Proposition 73 prohibits the transfer of funds between candidates and controlled committees of a single candidate. Section 85304.

---

1. Unless otherwise noted, all statutory references herein are to the California Government Code.

2. A "person" is defined to mean "an individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, association, committee, and labor organization." Section 85102(b).

3. A "political committee" is defined as "a committee of persons who receive contributions

from two or more persons and acting in concert makes contributions to candidates." Section 85102(c).

4. "Broad-based political committee" is defined to mean "a committee of persons which has been in existence for more than six months, receives contributions from one hundred or more persons, and acting in concert makes contributions to five or more candidates." Section 85102(d).

## II

## STATE POLITICAL RIGHTS AND THE FIRST AMENDMENT

Before there was a federal constitution the original 13 states had won the right to internal self-government by force of arms in the Revolutionary War. The creation of a federal government did not modify that right. *See Minor v. Happersett,* 88 U.S. 162, 175–76 (21 Wall.) (1875), 22 L.Ed. 627, 631 ("All the States had governments when the Constitution was adopted. In all, the people participated to some extent, through their representatives elected in the manner specifically provided. These governments the Constitution did not change."). Moreover, although the federal constitution guarantees to each state a republican form of government, Art. IV, § 4, that provision has been interpreted to assure the states that they would have the right to pass their own laws and form their own governments. *See Duncan v. McCall,* 139 U.S. 449, 11 S.Ct. 573, 35 L.Ed. 219 (1891).[5]

██ Despite the broad right of self-government enjoyed by the states, their conduct in that regard is not unreviewable. When the states banded together to form the United States, they limited the federal government's power to restrain various liberties by adopting as the first ten amendments to the Constitution the Bill of Rights. Those limitations were made applicable to the states themselves by the Fourteenth Amendment. *See, e.g., Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931) (due process clause of Fourteenth Amendment embraces right of free speech). Accordingly,

> [w]hen a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.

*Gomillion v. Lightfoot,* 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960). *See*

*also Baker v. Carr,* 369 U.S. 186, 229, 82 S.Ct. 691, 716, 7 L.Ed.2d 663 (1962) ("When challenges to state action respecting matters of 'the administration of the affairs of the State and the officers through whom they are conducted' have rested on claims of constitutional deprivation which are amenable to judicial correction, [the Supreme Court] has acted upon its view of the merits of the claim."). Thus, a state's broad power to regulate elections "does not extinguish the state's responsibility to observe the limits established by the First Amendment rights of the state's citizens." *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, ——, 109 S.Ct. 1013, 1019, 103 L.Ed.2d 271, 281 (1989) (*quoting Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986)).

Although the defendant-intervenors make much of the fact that the statutes considered here were adopted directly through the initiative process, that happenstance provides the statute with no special insulation from review for asserted constitutional infirmity. Rather, the Supreme Court has held that "[i]t is irrelevant that the voters ... enacted [a statute], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 295, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981).

In sum, the issues tendered by plaintiffs' challenge to Proposition 73 requires recognition of both the state's right of self-government and the overarching principles embodied in the Bill of Rights. Below I explain the relevant legal tests for resolving issues raised by this litigation.

██ As I have previously explained, to assess the constitutionality of a state election law when challenged on the grounds that it directly regulates rights protected by the First Amendment, a sequential analysis is required. It is first necessary to examine whether "the provisions in issue

---

**5.** By virtue of the equal footing doctrine, each new state which entered the Union enjoys the same right to self-government as the original states. *Coyle v. Smith,* 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911).

impinge upon rights protected by the First Amendment." *Service Employees Int'l Union v. FPPC*, 721 F.Supp. 1172, 1175 (E.D.Cal.1989) (hereinafter "SEIU"). If so, the court must then determine "if there is a sufficiently strong governmental interest served by [the statute's] restriction on them and whether the section is narrowly tailored to the evil which may be legitimately regulated." *Id.* at 1176 (quoting *FEC v. National Conservative PAC*, 470 U.S. 480, 496, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985)); *see also Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, ——, 109 S.Ct. 1013, 1019–20, 103 L.Ed.2d 271, 283 (1989).

Where state statutes do not directly restrict political speech or associational rights, but do limit plaintiffs' participation in the political process, as compared to other participants, the litigation has been characterized as being a hybrid First Amendment/Equal Protection question. *See Anderson v. Celebrezze*, 460 U.S. 780, 786 n. 7, 103 S.Ct. 1564, 1569 n. 7, 75 L.Ed.2d 547 (1983) ("In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis."). When such an attack is tendered, it appears that a somewhat less stringent standard applies. This court must be candid and recognize that the Supreme Court has been less than wholly successful in fixing upon a single applicable standard. The Ninth Circuit has explained, however, that in so-called "ballot access" cases, a paradigm of First/Fourteenth Amendment cases, "[n]o 'litmus paper' test exists.... Instead, a court must weigh (1) the character and magnitude of the asserted injury to first and fourteenth amendment rights that the plaintiff seeks to vindicate; and (2) the precise interests put forward by the State as justifications for the burden imposed by

its rule." *Erum v. Cayetano*, 881 F.2d 689, 692 (9th Cir.1989).[6]

In sum, whether the statute being considered is asserted to directly limit speech or comparatively limit effective participation in the electoral process, resolution of the suit requires a close examination of the restrictive effect of particular provisions and the justification tendered in support of those restrictions. A close examination of the constitutionality of the challenged provisions, however, must not be confused with an independent judgment concerning the wisdom of particular legislation. If a statute passes constitutional muster, the question of its wisdom is for the political process. *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 562, 64 S.Ct. 1162, 1178, 88 L.Ed. 1440 (1944).

Before undertaking the requisite detailed examination of the statutes in question, it seems appropriate to set out certain general principles pertaining to the evaluation of governmental interests tendered as justifications for statutes which trench upon rights protected by the First Amendment.

## III

### ASSESSING LEGITIMATE GOVERNMENTAL INTERESTS

Although in their brief defendants in intervention assert diverse governmental interests in support of Proposition 73,[7] until this year, "the anti-corruption in fact and appearance rationale [was] the only [legitimate government interest] sanctioned by the Supreme Court" in defense of political contribution and expenditure limitations. *SEIU*, 721 F.Supp. at 1177 n. 8. This past term, the High Court has identified an additional interest, namely, limiting "the corrosive and distorting effects of immense aggregations of wealth that are accumulat-

---

6. Because the plaintiffs eschew a strictly Fourteenth Amendment attack on the statute (*see* footnote 11), I do not pause to analyze the standards applicable to such litigation. *See Erum*, 881 F.2d at 694.

7. They include "limiting the actuality or appearance of corruption ... preserving the integrity of [the state's] election process ... and [the] sustenances of active, alert responsibility of the individual citizen in a democracy for the wise conduct of government...." Defendants in intervention's Trial Brief at p. 17.

ed with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Austin v. Michigan Chamber of Commerce*, — U.S. —, 110 S.Ct. 1391, 1397, 108 L.Ed.2d 652 (1990).

Because the Court has failed to articulate any standards for identifying when asserted governmental interests are sufficiently "strong" so as to support limitations on speech, it may become increasingly difficult to predicate in advance whether a tendered interest suffices. Whatever difficulty lower courts may have in determining the sufficiency of a governmental interest under these circumstances, surprisingly little consideration has been given to the problem of identifying and characterizing governmental interests. I now briefly examine that problem.

The High Court has explained that in determining whether a statute was motivated by a constitutionally prohibited purpose, it is necessary to consider "[t]he plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history [as well as] the historical context of the statute ... and the specific sequence of events" leading up to the statute's adoption. *Edwards v. Aguillard*, 482 U.S. 578, 594–95, 107 S.Ct. 2573, 2583–84, 96 L.Ed.2d 510 (1987).[8] The criteria for discerning legislative motive, however, do not bear on the question of identifying what legitimate governmental inter-

est is served by a statute when it is challenged as constitutionally infirm.

Both the plaintiffs and defendants have requested that the court make factual findings as to the interests served by Proposition 73, and the court has accommodated that request.[9] The court has done so because their belief that the issue of legitimate governmental interest is factual in character is not without case support. At least one court has held that an interest asserted must appear either in the legislation itself or there must be tendered "extrinsic evidence of such an interest." *National Advertising Co. v. Town of Babylon*, 900 F.2d 551, 555 (2d Cir.1990). The court in *Babylon* treated the identification of a governmental interest as an evidentiary issue, suggesting that in the absence of an interest declared in the statute, evidence must be tendered or at least the court must be capable of taking judicial notice of the interest. *Id.* at 556. As to the latter, that court asserted that "[a]t most, courts have taken judicial notice of a common sense linkage between a stated governmental interest and a restriction in order to assess whether ... [the] restriction directly advance[s] the governmental interest asserted...." *Id.* at 556.

■ With the greatest of respect to the Second Circuit and the parties, I do not agree that the issue of ascertaining a legitimate governmental interest sufficient to justify limitations on First Amendment rights is a matter for factual determina-

---

**8.** Of course, to speak of legislative motive, as contrasted with legislative intent, is to speak in terms of a literary device. While members of a legislative body have minds, the legislative body itself does not. Thus, to speak of "legislative motivation" is to speak in terms of a seductive metaphor. "Legislative intent," on the other hand, describes a legal term of art. It addresses the court's duty to determine what the legislative body provided for in the statute. *See Banco Mexicano de Commercio E Industria v. Deutsche Bank*, 263 U.S. 591, 602, 44 S.Ct. 209, 211, 68 L.Ed. 465 (1924) (the legislative will must be expressed in the words it chooses).

**9.** Pursuant to the parties' request the court has found as follows:
"III. GOVERNMENTAL INTERESTS SERVED BY PROPOSITION 73

"45. The primary governmental interest assertedly served by Proposition 73 is to limit the amount of money spent in political campaigns in California.
"46. Another interest assertedly served by Proposition 73 is to reduce corruption in the California political system.
"47. Another interest assertedly served by Proposition 73 is to reduce the appearance of corruption in the California political system.
"48. Another interest assertedly served by Proposition 73 is to reduce the public perception of undue influence by contributors of large amounts of money.
"49. Another interest assertedly served by Proposition 73 is to enlarge the number of contributors to political campaigns for public office in California."

tion.[10] On the contrary, it appears to this court that the Supreme Court has treated the matter as legal in character.[11]

The High Court has held that the interest which may be tendered as a sufficient justification to subordinate an individual's right of free speech need not reflect the original legislative motive (*see* footnote 8). Thus, the advancing of "interests ... concededly ... not asserted when the prohibition was enacted into law" is entirely proper. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 71, 103 S.Ct. 2875, 2882, 77 L.Ed.2d 469 (1983). The Court has explained that "[t]his reliance is permissible since the insufficiency of the original motivation does not diminish other interests that the restriction may now serve." *Id.* *See also Geary v. Renne*, 911 F.2d 280 (9th Cir. 1990) (Rymer, J. dissenting) (appropriate for court of appeals to consider interest not advanced by government); *but see In re Primus*, 436 U.S. 412, 434 n. 27, 98 S.Ct. 1893, 1906 n. 27, 56 L.Ed.2d 417 (1978) ("Rights of political expression and association may not be abridged because of state interests asserted by appellate counsel without substantial support in the record or findings of the state court"). It seems clear that if ascertaining the governmental interest justifying a statute's limitation on speech were a matter of fact, the historical interest would be the only one cognizable. The Court's contrary holding demonstrates that the issue is legal in character, and those defending the statute are free to advocate any interest, whatever the evils

the statute was originally intended to address.

While a conclusion that, in effect, the supporters of a statute attacked on First Amendment grounds may tender any rationale in its support may appear odd at first blush, I believe that conclusion is consistent with the mode of resolving such litigation. It must be kept in mind that once the interest is identified, the second and third legs of the test require that the statute actually serve the interest asserted and be narrowly tailored to that end. Thus, if governmental interests are tendered as justification for the statute, but the language of the statute cannot support the contention, or the statute is not narrowly tailored to serve the interest advanced, the rationale must fail and the statute will be struck down. This court must confess that treating governmental interests as legal seems less justified where the First/Fourteenth balancing test is applied. Given the less rigorous standards testing constitutionality in such cases, permitting wholly post hoc rationalizations to justify restrictions of rights may appear to denigrate the character of activities that are central to the maintenance of democratic norms. Of course, as always, given my role as a subordinate court, I am bound by the decisions of those courts hierarchically superior to this court. Given the analysis above, I am satisfied that the six findings set out in footnote 9 may be tendered in support of Proposition 73 as a matter of law.[12]

**10.** As I explain below, my analysis of how the Supreme Court has treated questions of "legitimate governmental purpose" leads me to conclude that such issues are properly characterized as "legal rather than factual." For the same reasons, I also believe that the issue may not be properly characterized as falling within the doctrine of "constitutional facts." *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 54, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296 (1971). Constitutional facts are truly factual in character, although given their special constitutional significance, each court having jurisdiction must make an independent assessment of the findings. *Id.*

**11.** As I have previously observed, "[l]aw traditionally is viewed as society's judgment as to competing values and thus a way of meaningfully ordering events in the physical universe.

Facts, on the other hand, are instances in the physical universe about which judgments are made." *Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F.Supp. 940, 943–44 n. 4 (1981).

**12.** If viewed as a factual matter, there is evidence to support each finding; namely, the language of the Proposition and the arguments found in the voter pamphlet in support of the Proposition. Plaintiffs' Exhibit 15. *See In re Lance W.*, 37 Cal.3d 873, 888 n. 8, 210 Cal.Rptr. 631, 694 P.2d 744 (1985) (ballot pamphlet is accepted source in determining voters' intention); *and see Lungren v. Deukmejian*, 45 Cal.3d 727, 740 n. 14, 248 Cal.Rptr. 115, 755 P.2d 299 (1988). The court has also considered the circumstances of the entire campaign. In the later regard, the court can and does take judicial notice that at the time Proposition 73 was

With all of the above in mind, I turn to an examination of the plaintiffs' discrete claims.

## IV

### THE PLAINTIFFS' CONTENTIONS

The original plaintiffs attack the provisions of Proposition 73, asserting that they unconstitutionally burden their rights of association and speech. They also argue that the proposition unconstitutionally favors incumbents over challengers, and unconstitutionally discriminates against women and ethnic minorities.[13] They assert that various sections of the proposition either serve no cognizable state interest or that those provisions are unnecessarily broad when construed to serve legitimate interests.

The Democratic Party's suit is pitched somewhat differently. It notes that under Proposition 73, the Party may not contribute more than $5,000 to any candidate in any fiscal year, or accept contributions or more than $2,500 from any one person in any fiscal year for the purpose of making contributions to a particular candidate. Sections 85302 and 85303(b). The Party then notes that section 82015 defines "contribution" as any "expenditure made at the behest of a candidate, committee or elected officer." The phrase "made at the behest of" has been interpreted by the Fair Political Practices Commission (hereinafter sometimes referred to as "the Commission")[14] to mean:

An expenditure by a political party, broad-based political committee, or political committee made at the behest of a candidate in connection with a communication directed to voters or potential voters as part of voter registration activities or activities encouraging or assisting persons to vote, is a contribution to that candidate only if the communication clearly identifies or expressly advocates the election or defeat of that candidate or a rival candidate for the same elective office.

California Code of Regulations, Title 2, section 18215(d).[15]

The Party takes the position that the Commission's present construction of the statute to permit registration efforts and communications at a candidate's behest, provided his name is not mentioned "still limit expenditures for the Party's most effective activities—voter registration and membership communications that mention candidates—to $5,000. Accordingly, the Party remains disabled from effectively performing its unique and crucial role in the political process." Plaintiff–Intervenor's Trial Brief at 8.

## V

### MONEY, POLITICS AND THE CONSTITUTION

#### A. *Fiscal Year Limitations*

■ The plaintiffs contend that limitations on contributions measured by fiscal year rather than by election, works an un-

---

adopted there was an alternative campaign reform on the ballot, Proposition 68. Although Proposition 73 was pitched as a major counterweight to Proposition 68, but without its public financing feature, the campaigns for both propositions asserted that they were instruments for political reform.

**13.** Although the original plaintiffs have been less than clear about their position, as the court understands it, they do not press a separate claim under the Equal Protection Clause of the 14th Amendment; rather, they claim that the effect of the proposition works a deprivation or diminution of the First Amendment rights of minorities, women, and challengers. In effect then, they launch both a First Amendment and what the court has described above as a

First/Fourteenth attack on various of Proposition 73's provisions.

**14.** The Commission is the agency charged with civil enforcement of the proposition.

**15.** Originally, the Commission adopted a more restrictive interpretation providing that "made at the behest of" included "a payment made under the control or at the direction of, in cooperation, consultation, coordination, or concert with, or at the request or suggestion of a candidate, controlled committee, official committee of a political party, or organization formed or existing primarily for political purposes." That regulation was amended to adopt the present form subsequent to the Democratic Party's intervention in this litigation.

constitutional preference for incumbents and against challengers. Plaintiffs also contend that the statute unconstitutionally disfavors candidates who determine to enter a particular campaign at a late date.

By virtue of the trial, the court has found that, as a general matter, incumbents have a significant natural advantage over challengers.[16] Moreover, given the way the statute works, an elected official can, and most do, raise substantial amounts of money each of the years of incumbency, while as a general matter challengers cannot, and generally do not, do so.[17]

The situation for challengers is entirely different than for incumbents. First, for a variety of practical reasons, few non-incumbents will decide to run for a particular office years in advance of the election. Even if they do, they will have significant trouble in raising money early in the election cycle.[18] Although challengers need not outspend incumbents in order to win, they must raise significant amounts of money to reach a threshold level of name recognition and candidate viability.[19] Thus, the effect of the fiscal year provisions is to favor the fundraising efforts of incumbents to the disadvantage of those who challenge them for office. Given the fluid character of the events which lead to a candidate challenging an incumbent, and the monetary advantage which incumbents have by virtue of measuring the contribution limita-

tions by fiscal years rather than elections, the plaintiffs urge that a fiscal year limitation is unconstitutional.

In accordance with the method recognized above, I first turn to an examination of the question of whether measuring contribution limitations by a fiscal year constitutes a burden upon First Amendment rights.

It is clear that "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). Although the plurality in *Buckley* asserted that contribution limits entail "only a marginal restriction upon the contributor's ability to engage in free communication," *id.* at 21, 96 S.Ct. at 635, the High Court has since come to recognize that contribution limits "automatically affect[ ] expenditures, and limits on expenditures operate as a direct restraint on freedom of expression." *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 299, 102 S.Ct. 434, 439, 70 L.Ed.2d 492 (1981). Moreover, it appears obvious to this court that contributions made to a common fund for the purpose of forwarding a particular candidacy is a function of rights of association which are protected by the First Amendment. *See FEC v. National Conservative PAC,* 470

---

**16.** Finding of Fact No. 118: "Incumbents running for office generally enjoy a substantial advantage over challengers because they ordinarily have greater resources, name-recognition, access to the media, and a greater ability to raise money. These advantages are generally the result of their being in office and the likelihood that they will remain in power."

**17.** Finding of Fact No. 133: "In state races in the off-years 1983, 1985, and 1987, all incumbents, but very few challengers, engaged in fundraising. The average incumbent also substantially outraised the challengers who did raise money in the off-year. In statewide constitutional office races in the off-years 1983 and 1985, incumbents outraised challengers by an average of almost 9 to 1. In State Senate races in the off-years ..., incumbents outraised challengers by an average of more than 40 to 1. In State Assembly races in the off-years ..., incumbents outraised challengers by an average of more than 70 to 1."

**18.** Finding of Fact No. 129: "Challengers raise very little money early in the election cycle. Most challengers do not decide to run until relatively late in the cycle because the prospects for success ... cannot be assessed years in advance of the election. Even those challengers who decide to run early have trouble raising money because contributors will generally wait to see if the candidate is viable, in particular whether the candidate can even win the primary, before investing in the campaign."

**19.** Finding of Fact No. 122: "Because they start at a disadvantage, challengers ... must raise and spend a considerable amount of money to reach a threshold level of name recognition and image necessary to make the race competitive. Challengers who fail to raise and spend the threshold amount rarely have a chance to win."

U.S. 480, 495, 105 S.Ct. 1459, 1467, 84 L.Ed.2d 455 (1985).

Acknowledging that making campaign contributions constitutes activity protected by the First Amendment does not resolve the issue of whether or not the fiscal year provisions at bar burden such activity. It appears to this court that the answer to that question must be "yes." If contributing to political campaigns constitutes activity protected by the First Amendment then, it must follow, that limitations upon such contributions constitute a burden upon First Amendment activity. Because any limitation is composed of two elements—a monetary limit and a durational limit, I conclude that the fiscal year limitations in and of themselves constitute a burden upon First Amendment activity.[20]

Having determined a limitation based upon a fiscal year measurement does constitute a burden upon free speech, I must now examine the justifications tendered in support of a fiscal year measure. Defendants contend that a fiscal year structure serves the legitimate governmental interest of permitting

> [S]uccessful candidates in the June primary [to] as of July 1 of the same year, receive new contributions from the general election from contributors who gave the candidate the maximum allowable contributions for the primary election.... Also, political action committees and political parties who spend contributions given to them for the June primary can, as of July 1, receive additional contributions from the same contributors and use them for the November general election.

Defendants' Trial Brief at 6. The Defendants in Intervention, on the other hand, do not seek to defend the fiscal year measurement per se, but rest their defense of that aspect of the statute upon the undoubted right of the state to regulate contributions in general. *See* Defendants in Intervention's Trial Brief at 11(ff). Thus, as the court understands these defendants' contentions, they are that given the fact that the state has a right to limit contributions in some fashion, measuring by a fiscal year is simply one mode, as legitimate as any other, under which regulation may be accomplished.

It appears to this court that the defendants' contentions have weight only if the statute is subject to review under the Fourteenth Amendment rational classification test. Here, however, as the court understands the position adopted by all parties, some form of heightened scrutiny must be applied by virtue of the fact that fiscal contributions constitute some form of protected speech, or, in any event, implicate equal opportunity to participate in elections. Under such circumstances, whether one employs the stringent standards ordinarily applicable to restrictions upon First Amendment rights, or the balancing test applicable to First/Fourteenth equal opportunity to engage in political activity, the fiscal year provisions of Proposition 73 must fail.

The statute clearly fails the legitimate governmental interest and narrow tailoring test since the fiscal year restrictions, providing as they do a major benefit to incumbents, cannot be sustained upon the rationale that they provide an opportunity for separate contributions to each election. Clearly, a contribution limitation by election, rather than by fiscal year, accomplishes the same result without providing incumbents with the significant benefit that the fiscal year provisions accord them. For the same reason, a rationale premised on the state's right to regulate campaign contributions is equally unavailing.

---

**20.** The court recognizes that its holding above is not wholly consistent with a notion expressed by various pluralities of the High Court that contributions to political campaigns constitute "only a marginal restriction upon the contributor's ability to engage in free communication" since such contributions may be characterized as speech by proxy. *See Buckley*, 424 U.S. at 20–21, 96 S.Ct. at 635; *see also California Medi-* *cal Ass'n v. FEC*, 453 U.S. 182, 196, 101 S.Ct. 2712, 2721, 69 L.Ed.2d 567 (1981). All that this court can say is that as best it can determine, the "speech by proxy" notion has never commanded a majority of the Court, and it appears to be inconsistent with the evolving First Amendment doctrine. Moreover, even if only a "marginal restriction," such limitations are nevertheless restrictions.

Examining the fiscal year limitation under the balancing provisions of the equal participation cases produces the same result. The circuit has explained that in weighing the "precise interests put forward by the State" against "the character and magnitude of the asserted injury," it is necessary to "not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Erum*, 881 F.2d at 692 (*quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983)). Here, what is at stake is the ability of candidates to compete for contributions on an equal basis as a matter of fact. Because contributions translate into political speech, the favoring of incumbents over challengers constitutes a significant impediment to fair access to the electoral process. Given that the state has a simple and direct way of assuring its asserted governmental goal of permitting contributions to both primary and general elections, but can do so without benefitting incumbents, it seems clear that in any weighing the statute must fail.[21] From all of the above, I conclude that Proposition 73, in measuring the limitation on campaign contributions by fiscal year rather than election, unconstitutionally restricts free speech and favors incumbents against challengers, and must be found to violate the First and Fourteenth Amendments to the United States Constitution.

■ I must now consider whether I may sever the unconstitutional "fiscal provision" from the rest of the statute.[22] *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506, 105 S.Ct. 2794, 2803, 86 L.Ed.2d 394 (1985) (an unconstitutional provision of a state statute may be severed where to do so will not frustrate intent of legislature).[23] I conclude that the fiscal year provisions cannot be severed from the financial limitations themselves and thus, the entire provision must be struck down. It is, of course, true that the court could strike the word "fiscal" from the various provisions of Proposition 73. But to do so would simply put the statute on some annual basis, and the exact vice noted above would be replicated. Indeed, such a revision not only would fail to cure the constitutional problem, it would frustrate the asserted legislative purpose of providing contributors with an opportunity to contribute to both primaries and general elections. Under such circumstances, severing the word "fiscal" is wholly inappropriate. *Id.* Accordingly, I must find that all the provisions of Proposition 73 relating to limitations on campaign contributions, because they are measured by a fiscal year, violate the Constitution of the United States and are unenforceable.

Given my conclusion that the fiscal year provisions are both unconstitutional and not severable, I need not reach various other contentions made by the plaintiffs. Thus, it is unnecessary for the court to resolve the questions of whether the level of contribution established by the statute coupled with the absence of an escalator clause is unconstitutional. Additionally, since the expenditure limitations relative to unions and political parties are also measured by fiscal years, the court believes it need not reach the separate contentions made by the Union plaintiffs and the Democratic Party.

**21.** Finally, the court notes that even as a straight Fourteenth Amendment matter, it is uncertain that this statute would pass muster. While it is certainly true, as *Buckley* has suggested, that a court should be hesitant to strike down a statute which is even-handed on its face, *see* 424 U.S. at 31, 96 S.Ct. at 641, it is clear in this case from the "record evidence" that the statute works a significant "invidious discrimination against challengers as a class." *Id.*

**22.** Proposition 73 contains a severance clause. *Calfarm Ins. Co. v. Deukmejian*, 48 Cal.3d 805, 821–22, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989).

**23.** California cases provide three criteria for severability: the invalid provision must be mechanically and grammatically severable; it must be functionally severable; and it must be volitionally severable in the sense the statute would have been adopted if the legislative body had foreseen the partial invalidity. *See Calfarm Ins. Co. v. Deukmejian*, 48 Cal.3d 805, 821–22, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989).

## B. *Transfer Bans*

### 1. Transfers Among a Candidate's Own Committees

■ On May 19, 1989, this court issued a preliminary injunction, finding the ban on transfers among a candidate's own committee burdens First Amendment rights and serves no compelling state interest sufficient to justify those burdens. The court believes that the injunction should be made permanent. It is clear that the ban acts as an expenditure limitation; such limitations have never been upheld, save in connection with the expenditures of corporations. Moreover, the sole justification offered for the inter-committee transfer ban, is a notion that contributions given for one office ought not be diverted to another, because the donation was solicited and given with a particular office in mind. This "trust" theory, which suggests donations are premised upon the office rather than the candidate, may, of course, sometimes be true; on the other hand, as evidence in this trial demonstrated, it is sometimes false.[24] More to the point, it is clear that to the extent the provision is intended to insure truth in soliciting, a narrower and more efficacious means is readily at hand. Such a purpose is easily served by requiring that the candidate inform potential donors of his intentions, or if he is unable to do so, to acknowledge that the sums raised could be expended on other races. For these reasons, and essentially for the reasons argued by plaintiffs in their points and authorities in support of preliminary injunctive relief, the court enjoins the enforcement of those provisions of Proposition 73

prohibiting transfers between the various committees of the same candidate.

### 2. Inter–Candidate Transfers

■ Plaintiffs also attack those provisions of Proposition 73 which ban all transfers between candidates.[25] They argue that once a contribution is received by a candidate, his decision to contribute to another candidate should be viewed as an expenditure rather than a contribution, and that the ban works a particular hardship on minority candidates.

The evidence before the court has demonstrated that contributing to other candidates is a recognized means of seeking and maintaining leadership positions in California's legislative bodies.[26] In that sense, it may be said that at least for members of the legislature seeking leadership positions, transfers can be viewed as expenditures for office. Even if so viewed, however, it is not clear to this court that such expenditures should enjoy the special solicitude accorded expenditures under *Buckley.* That special solicitude grew out of the Supreme Court's recognition that expenditures constitute direct political speech, an activity at the core of First Amendment protection. Here, even if the transfer is for the purpose of forwarding the transferor's ambition for legislative leadership, it is not transmuted into political speech until expended by the transferee. Under this analysis, it appears to the court that transfers from candidates ought to enjoy a status and protection no different than that accorded donations in general.[27]

---

**24.** Finding of Fact No. 102: "Plaintiff Allen Ruby contributes to candidates to use funds for whatever office the candidate wishes to pursue. He wishes to support the political ideas of each candidate, not necessarily their race for a particular office."

**25.** It appears to the court that these provisions are not resolved by the court's fiscal year determination above, since unlike the political party or political committee limitations which are premised on fiscal years, the provisions in question are absolute bans.

**26.** Finding of Fact No. 91: "Among other reasons, candidates transfer campaign funds to other candidates in aid of the transferor's goal of

attaining a leadership position in the legislature."

Finding of Fact No. 92: "While transfers render fundraising ability an important criterion in the selection of legislative leaders, the leadership office is itself a significant aid in fundraising."

Finding of Fact No. 93: "Fundraising for other legislators is a traditional leadership duty."

**27.** As I explained in footnote 20, *supra,* the notion that contributions are less worthy of protection because they do not constitute speech has not commanded a clear majority of the Court. My observations above, although they appear to adopt a speech by proxy argument, seek to make a different point. It appears to

The record also demonstrates that, in general, minority candidates, and particularly minority challengers, have greater difficulty raising funds than white male candidates.[28] Moreover, the record demonstrates that because incumbents have, as a general matter, a greater ability to raise money than challengers[29], a process has developed under which incumbents raise money for challengers in truly competitive elections.[30] This process is especially important to minority challengers since they must raise sufficient funds early enough[31] to reach the required threshold so that they may be seen as a viable candidates worthy of contributions on their own.[32]

Notwithstanding the fact that as a practical matter partisan transfers have had a beneficial effect upon the race of at least some minority candidates[33], plaintiffs cannot sustain their burden of demonstrating that the prohibition on candidate transfers works an unconstitutional burden on minority candidates. On the other hand, given my ruling on the fiscal year provisions, the ban on contributions cannot be sustained on the grounds advanced by the defendants, and it too must be declared unenforceable. I turn first to plaintiffs' First/Fourteenth claim.

As I noted above, it is clear that minority challengers face problems in raising funds which are not shared by others. Those problems, however, are not the product of legal restrictions upon their right to raise funds, nor do the provisions at bar, like the fiscal year provisions, by their nature, favor incumbents, white male or otherwise. Rather, the problems faced by such candidates grow out of the perceptions of potential contributors and the socio-economic reality of minority populations in California; issues which plaintiffs' constitutional challenge do not address. Put another way, as I now explain, because the statutes are essentially irrelevant to the problem faced by minority candidates as a class, striking them down will have no effect upon the realities of California campaign financing. For this reason, plaintiffs cannot sustain their attack on the statute premised on an assertion that the statutes discriminated against minority candidates as a class.

I begin by observing that while it is true that the present legislative leadership has contributed to some minority challengers, it is equally true that transfers have been used to support incumbents.[34] For the same reason, if the court were to declare the transfer ban unconstitutional on the ground that it adversely affected minority candidates, there is no reason to believe that minority candidates as a class would benefit. The basis for this conclusion

this court that contributions made by legislators for the purpose of furthering the goal of attaining or maintaining a legislative leadership position, are for First Amendment purposes, of a different order than all other contributions. In the former case, the purpose of the donation does not bear on political discourse at all, and it only achieves the character of political speech when made available to the candidate.

**28.** *Finding of Fact No. 146:* "Minority challengers have difficulty raising funds for election campaigns because of negative stereotypes, and because minority supporters are often economically underprivileged."

**29.** *See* Finding of Fact No. 118 at footnote 16, *supra.* Finding of Fact No. 127: "In general, incumbents can raise money from a wider variety of sources than challengers. . . ."

**30.** Finding of Fact No. 138: "Political science literature defines 'competitive races' as those where the winner received 55% of the vote or less. This is a reasonable definition."

**31.** Finding of Fact No. 144: "Transfers from established officeholders are often necessary to help a minority challenger begin a campaign."

**32.** *See* Finding of Fact No. 122 at footnote 19, *supra.* Finding of Fact No. 135: "Money raised early in an election cycle is generally worth more to the candidate than money raised later on because the early money can become seed money used to raise more money."

**33.** Finding of Fact No. 145: "Willard Murray, the first black assemblyman to win election in his majority white district, received large amounts in transfers from other candidates to help his campaign."

**34.** Finding of Fact No. 106: "In the three general election years immediately preceding the effective date of Proposition 73, incumbents in contested California legislative races received more money in transfers from other candidates than their challengers in 106 out of 146 races in which such transfers were made."

seems obvious; decisions by candidates to transfer funds, like the decision of any contributor, are made on the basis of a series of subjective judgments focusing on the candidate's potential for success or a desire to associate with a candidate's political position regardless of the candidate's likelihood of success. Since eliminating the ban of transfers would have no effect upon the reasons that minority candidates as a class do or do not receive contributions, it will have no appreciable effect upon minority candidates, as a class, receiving or not receiving donations. Put another way, while the absence of a transfer ban would permit transfers to minority candidates, it would not compel them, and there is simply no basis to suggest that minority candidates as a class, as contrasted with individual candidates, would benefit. Such a conclusion completely undermines an attack on the statute which is premised on the asserted class bias of the provision.

The attack on the complete ban of transfers premised on pure First Amendment grounds, however, would appear to fair much better. As I noted above, there is no dispute that political contributions are some form of protected speech,[35] though there is dispute as to the level of protection they enjoy. Accordingly, plaintiffs have satisfied the first step in the analytical process and the burden now shifts to defendants to demonstrate that the transfers serve some legitimate governmental interest.

Both the defendants and the defendants-in-intervention argue that the provision is a necessary corollary to those provisions setting contribution limitations. They note that under *Buckley*, provisions which seek to limit opportunities to do indirectly that which is prohibited directly, have been upheld. *See California Medical Ass'n v. FEC*, 453 U.S. 182, 198, 101 S.Ct. 2712, 2722, 69 L.Ed.2d 567 (1981). They maintain that the transfer ban is simply a device to prevent those who desire to avoid the con-

tribution limits from doing so by the simple expedient of using another candidate as a conduit for the contribution.

Defendants' argument would have significant weight if Proposition 73's campaign limitations were in effect. Given the determination above that limitations premised on a fiscal year cannot withstand constitutional scrutiny, the ban, to the extent it is premised on the need to prevent subversion of fiscal year limitations, must also fail.[36]

Neither defendant has made the argument that the provisions in question are also justified on the basis of avoiding fraud on contributors who intended to donate to a certain candidate's campaign but not to the transferee's. It appears to this court that such an argument, if made, must fail for two reasons. First, contributions are fungible, and thus there is no way to trace particular transfers to particular contributors; second, any such justification would fail the narrowly tailored prong of the First Amendment test for the same reasons the candidate committees ban failed.

## V

### ORDER

For all of the above reasons, relative to those provisions of the California Government Code adopted as Proposition 73, THE COURT ORDERS AS FOLLOWS:

1. All contribution limitations measured on a fiscal year basis violate the provisions of the First Amendment to the Constitution of the United States and are hereby declared unenforceable; accordingly, enforcement of all such provisions are PERMANENTLY RESTRAINED;

2. All provisions prohibiting candidates from transferring contributions among or between the candidate's own committees violate the provisions of the First Amendment to the Constitution of the United States and are hereby declared unenforcea-

---

**35.** Whatever motive may cause certain legislative leaders or aspirants to legislative leadership to contribute to some candidates, the ban is not limited to such a class, assuming that such a class could be identified.

**36.** The court expresses no opinion upon the relationship of the transfer ban to any campaign limitations arising out of other provisions of California law, including Proposition 68.

**594**

ble; accordingly, enforcement of all such provisions are PERMANENTLY RESTRAINED;

3. All provisions prohibiting candidates or elected officials from making contributions to other candidates from their own campaign funds insofar as they are premised upon the need to prevent evasion of campaign contribution limitations based on fiscal years violate the provisions of the First Amendment to the Constitution of the United States and are hereby declared unenforceable; accordingly, enforcement of all such provisions are PERMANENTLY RESTRAINED;

Let judgment enter accordingly.

IT IS SO ORDERED.