[No. S025815. Dec. 20, 1993.]

WALTER B. GERKEN et al., Petitioners, v.
FAIR POLITICAL PRACTICES COMMISSION et al., Respondents;
STATE OF CALIFORNIA, Intervener.

## COUNSEL

Munger, Tolles & Olson, Bradley S. Phillips, Mark H. Epstein, Strumwasser & Woocher and Fredric D. Woocher for Petitioners.

Glenn L. Rigby, Peter S. Pierson, John R. Akin, Kathryn Allen, Ben Davidian, Scott Hallabrin and Deanne Stone for Respondents.

Bell & Hiltachk, Charles H. Bell, Jr., Thomas W. Hiltachk, Carlsmith, Ball, Wichman, Murray, Case, Mukai & Ichiki, Allan E. Tebbetts, Daniel J. Payne, Kopp & Di Franco, Quentin L. Kopp, Ross Johnson, Olson, Connelly, Hagel, Fong & Leidigh, Lance H. Olson and George Waters as Amici Curiae on behalf of Respondents.

Daniel E. Lungren, Attorney General, Cathy Christian, Manuel M. Medeiros and Daniel G. Stone, Deputy Attorneys General, for Intervener.

Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen and Julie M. Randolph as Amici Curiae on behalf of Intervener.

**OPINION**

**LUCAS, C. J.**—Propositions 73 (Gov. Code, tit. 9, ch. 5, art. 1 et seq.)[1] and 68 (*ibid.*), both designed to implement campaign contribution reform, were each approved by the voters at the June 1988 Primary Election. The former garnered more affirmative votes than the latter. In *Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744 [274 Cal.Rptr. 787, 799 P.2d 1220] (hereafter *Taxpayers*), we held that under California Constitution, article II, section 10, subdivision (b), "when two or more measures are competing initiatives, . . . only the provisions of the measure receiving the highest number of affirmative votes [can] be enforced." (51 Cal.3d at p. 747.) Accordingly, we declined to "merge" the two measures, and instead held that Proposition 73 was effective and that Proposition 68 was inoperative. (*Id.,* at pp. 770-771.) At the conclusion of our opinion, we observed in a footnote:

"The United States District Court has recently restrained enforcement of the Proposition 73 restrictions on campaign contributions and transfers thereof. (*Service Employees* v. *Fair Political Practices* (E.D.Cal. 1990) 747 F.Supp. 580 [*Service Employees I*].) That decision is not final, however, and does not invalidate the remainder of Proposition 73. [¶] For that reason, we need not decide in this proceeding whether an initiative measure that has no effect at the time it is adopted because it is superseded by another measure adopted by a larger vote at the same election becomes effective *if the latter is subsequently invalidated.* (Cf. *Corning Hospital District* v. *Superior Court* (1962) 57 Cal.2d 488, 494 [20 Cal.Rptr. 621, 370 P.2d 325].)" (*Taxpayers, supra,* 51 Cal.3d at p. 771, fn. 13, italics added.)

In this original mandamus proceeding (Cal. Const., art. VI, § 10; Cal. Rules of Court, rule 56(a)), petitioners[2] raise the issue reserved in *Taxpayers:* Noting that the Ninth Circuit Court of Appeals has affirmed the district court decision cited above (see *Service Emp. Intern.* v. *Fair Political Prac. Com'n* (9th Cir. 1992) 955 F.2d 1312 [(hereafter *Service Employees II*]), and that the high court has denied certiorari review of that judgment (__ U.S. __ [120 L.Ed.2d 922, 112 S.Ct. 3056]), petitioners assert Proposition 73 has been invalidated, and Proposition 68 should be revived by operation of law.

---

[1] Further statutory references are to this code.

[2] Petitioners are Walter B. Gerken, Melvin B. Lane, John Larson, Cornell C. Maier, Rocco C. Siciliano, Jean R. Wente, Francis M. Wheat and California Common Cause.

We issued an alternative writ.[3] Thereafter respondents[4] advised us that they would take no position on the merits of the suit. We subsequently permitted the State of California, represented by the Attorney General, to intervene, and we allowed participation as amici curiae in opposition to petitioners by legislators, labor unions, and a lobbying group,[5] as well as the state Republican and Democratic parties.

For reasons explained below, we conclude Proposition 73 remains effective in substantial part; accordingly, it has not been "invalidated" as we used that term in *Taxpayers*, *supra*, 51 Cal.3d at page 771, footnote 13. It follows that, as we held in *Taxpayers*, *supra*, Proposition 68 remains inoperative. Hence, we will discharge the order to show cause, and deny the writ.

## I. *Background*

*Taxpayers*, *supra*, 51 Cal.3d at pages 748-755, describes in detail the competing schemes set out in Propositions 73 and 68. Briefly, Proposition 73 proposed to impose limits on campaign contributions for all elective offices; prohibit the use of public funds for campaign expenditures; and prohibit elected officials from spending public funds on newsletters and mass mailings. (See *Taxpayers*, *supra*, 51 Cal.3d at pp. 749-751.) Proposition 68, by contrast, proposed to impose contribution limitations on state legislative candidates, and further proposed to impose *expenditure* limitations on those qualified candidates who elected to receive partially state-funded matching funds. (See *Taxpayers*, *supra*, 51 Cal.3d at pp. 751-754.) As noted above, we held in *Taxpayers* that because the two schemes were presented to the voters as alternative, competing measures, only Proposition 73, which received the higher number of affirmative votes, was effective.

Shortly before we filed our opinion in *Taxpayers*, the federal district court considered challenges to, inter alia, three key sections of the "contribution limitations" provisions of Proposition 73. (*Service Employees I*, *supra*, 747 F.Supp. 580.) The plaintiffs in that litigation asserted that because the

---

[3]The alternative writ directed respondents to: "(a) cease implementation of Proposition 73, and to enforce Proposition 68 in its entirety; or [¶] (b) show cause before this court why a peremptory writ of mandate should not issue directing you to cease implementation of Proposition 73, and to enforce Proposition 68 in its entirety; or [¶] (c) show cause before this court why a peremptory writ of mandate should not issue directing you to implement and enforce all but the public financing and expenditure limitation provisions (arts. 4 and 5 of secs. 1 and 2) of Proposition 68. . . ."

[4]Respondents are the Fair Political Practices Commission and the Franchise Tax Board.

[5]Amicus curiae briefs have been filed by: (i) Assemblyman Willie L. Brown, State Senator David Roberti, the California Teachers Association, the Laborers International Union of North America, and the California Conference of Machinists; (ii) State Senator Quentin L. Kopp and Assemblyman Ross Johnson; and (iii) the Institute of Governmental Advocates.

contribution limitations of Proposition 73 (§§ 85301-85303) are measured on a fiscal year instead of an "election cycle" basis, they unconstitutionally discriminate in favor of incumbents and their supporters and against challengers and their supporters. The various other parts of Proposition 73 (described below) were not challenged.

The district court found the fiscal year provisions of Proposition 73 unconstitutional under the First Amendment. (*Service Employees I, supra,* 747 F.Supp. at p. 590.) It next addressed the state law issue of whether those provisions might be severed from the contribution limitations themselves, and concluded that the statutes could not be saved. (*Ibid.*) Accordingly, it struck the contribution limitations and permanently enjoined their enforcement. (*Id.,* at p. 593.) Thereafter, as noted above, the Ninth Circuit Court of Appeals affirmed the judgment of the district court, and the high court denied certiorari review. On the federal constitutional issue, the Ninth Circuit agreed with the district court, and found the statutes as enacted violate the First Amendment. (*Service Employees II, supra,* 955 F.2d at p. 1320.) On the state law issue of whether the statutes might be saved by a construction that would eliminate the constitutional problems consistently with the voters' intent, the Ninth Circuit also agreed with the district court that sections 85301-85303 cannot be saved or reformed. (955 F.2d at p. 1321.)[6]

The primary provisions of Proposition 73 that are not subject to the federal injunction are these:

*Rules regarding solicitation and use of funds.*

Section 85200 requires that candidates file a written statement of intent to run for office before soliciting contributions, and section 85201 requires that candidates deposit campaign funds into a single "campaign contribution account," and that all campaign expenditures be made from that account. In addition, section 85202, which was repealed (Stats. 1990, ch. 84, § 3) and reenacted, as amended, as section 89510, provides, inter alia, that contributions to a campaign are held in trust for use in election to the office stated in section 85200.

*Prohibition on public funding.*

Section 85300 provides, "No public officer shall expend and no candidate shall accept any public moneys for the purpose of seeking elective office."

---

[6]In making this latter assessment, the Ninth Circuit considered only federal, and not state, law. (*Ibid.*) Neither the parties in this case, nor the various amici curiae (including amici curiae State Senator Quentin Kopp and Assemblyman Ross Johnson, who sponsored Proposition 73), challenge the Ninth Circuit's statutory analysis in this regard, nor does any party or amicus curiae request this court to adopt a "saving" or "reformed" construction of the statutes at issue in order to resolve petitioners' claim.

*Rules for special elections.*

Section 85305 establishes contribution limits in special elections, and section 85304 (insofar as it applies to special elections) bans transfer of funds between candidates.

*Regulation of honoraria.*

Former section 85400, which regulated gifts and honoraria, was repealed (Stats. 1990, ch. 84, § 3.5) and reenacted, as amended, as section 89502, which provides: "(a) No elected state officer may accept an honorarium."

*Prohibition on publicly funded newsletters and mass mailings.*

Section 89001 provides, "No newsletter or other mass mailing shall be sent at public expense."

## II. *Analysis*

Petitioners assert that because Proposition 73's contribution limitations (insofar as they apply to primary and general elections) have been invalidated and their enforcement enjoined, the remaining parts of Proposition 73, which are not subject to the injunction, are likewise unenforceable because they are nonseverable from the invalidated portions of the measure.[7] In other words, petitioners claim Proposition 73 has been invalidated in its entirety as a result of the federal injunction.

Although the various amici curiae on behalf of respondents contest petitioners' severability argument, intervener State of California declines to do so, and instead asserts we should defer any severability analysis until we are first satisfied that the provisions of Proposition 73 enjoined by the federal courts are "in fact" unconstitutional and void. Intervener contends we should not assume, merely because the federal courts have enjoined enforcement of Proposition 73's campaign contribution limitations, that those provisions are in fact unconstitutional. To this end, intervener has filed both a demurrer (Code Civ. Proc., § 1089; Cal. Rules of Court, rule 56(e)) and an answer to the petition, in which it asserts that under the separation of powers doctrine, the federal court judgments "cannot have the legislative effect of enabling Proposition 68 as the governing statutory scheme."

---

[7]"Although the initiative process differs from the legislative process in that it does not permit amendments and a collective weighing of the relation of the parts of the enactment, it is nonetheless subject to the severability doctrine. (See *Santa Barbara [Sch. Dist.* v. *Superior Court* (1975)] 13 Cal.3d 315 [118 Cal.Rptr. 637, 530 P.2d 605].)" *(People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 332 [226 Cal.Rptr. 640].)

We decline intervener's suggestion that we should inquire into the correctness of the federal courts' constitutional analysis because, as explained below, even assuming Proposition 73's contribution limitations are "in fact" unconstitutional, we would not grant the relief prayed for by petitioners, in light of our application of the severability principles next discussed.[8]

### A. The severability doctrine

Proposition 73 contains a severability clause that provides: "If any provision of this act, or the application of any such provision to any person or circumstances, shall be held invalid, the remainder of this act to the extent it can be given effect, or the application of those provisions to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby, and to this end the provisions of this act are severable." (Prop. 73, § 4.)

As we recently stated in *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247] (*Calfarm*), " 'Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable. . . .' " And yet, we noted, " '[s]uch a clause plus the ability to mechanically sever the invalid part while normally allowing severability, does not conclusively dictate it. The final determination depends on *whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable. . . .' "* (*Ibid.*, italics added; see also *Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605] [*Santa Barbara*].)

"The cases prescribe three criteria for severability: the invalid provision must be grammatically, functionally, and volitionally separable." (*Calfarm, supra,* 48 Cal.3d at p. 821; see *Santa Barbara, supra,* 13 Cal.3d 315, 331.) Petitioners concede the various remaining parts of Proposition 73 meet the first two parts of this test. They focus exclusively on the third aspect of the above test, which has been characterized as follows: "[T]he provisions to be severed must be so presented to the electorate in the initiative that their significance may be seen and independently evaluated in the light of the assigned purposes of the enactment. *The test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the*

---

[8]Accordingly, we will overrule intervener's demurrer as moot, and we need not address its separation of powers challenge to "revival" of Proposition 68.

*parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions.*" (*People's Advocate, Inc.* v. *Superior Court, supra,* 181 Cal.App.3d 316, 332-333, italics added.) We briefly review the prior cases in order to illustrate how the third part of the severability test has been applied.

*Santa Barbara, supra,* 13 Cal.3d 315, concerned Proposition 21, enacted in the 1972 General Election. The measure was designed to curtail forced school busing. We held that one provision of the measure, which "forced . . . the local school districts [to embrace the] neighborhood school concept" and barred forced busing, was unconstitutional. (13 Cal.3d at p. 331.) We further held, however, that a second provision, which repealed a statutory commitment to achieve racial balance in schools, and which left local school districts "with sole responsibility and without direction other than constitutional mandate" (*ibid.*), was severable and enforceable. We concluded: "Even though [the] restriction of local school district discretion is unconstitutional and therefore the full purpose of Proposition 21 cannot be realized, *it seems eminently reasonable to suppose that those who favored the proposition would be happy to achieve at least some substantial portion of their purpose,* namely to eliminate a state commitment to racial balance in the schools regardless of other considerations, and thereby to allow local control subject only to constitutional restriction." (*Id.,* at pp. 331-332, italics added.) *Santa Barbara* stands for the proposition that if a part to be severed reflects a "substantial" portion of the electorate's purpose, that part can and should be severed and given operative effect.

Thereafter, in *Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180 [185 Cal.Rptr. 260, 649 P.2d 902], we considered a city ordinance banning off-site billboards. We noted the ban was unconstitutional as applied to noncommercial billboards (*id.,* at p. 182), and rejected the suggestion that the invalid portion should be severed from the balance of the measure, so that the ordinance would apply only to commercial on-site billboards. We explained it was "doubtful whether the purpose of the original ordinance is served by a truncated version limited to commercial signs" (*id.,* at p. 190), and we noted that it appeared the local government might actually prefer a wholly separate alternative scheme if it were to start anew with the understanding that it lacked authority to ban noncommercial advertising. (*Id.,* at pp. 190-191.)

*People's Advocate, Inc.* v. *Superior Court, supra,* 181 Cal.App.3d 316, concerned whether generally valid provisions of an initiative requiring public reports regarding the Legislature's use of its contingent fund could be severed from an invalid restriction on the amount of that fund. The court

concluded the reporting provisions were severable, in part because the initiative set out "anti-secrecy" policy arguments that supported the public reports requirement, separate and distinct from the arguments related to the invalid contingency fund restrictions. Because the two policies were so clearly distinguished, the court concluded that "sufficient attention was drawn to the issue of secrecy to identify it as worthy of independent consideration." (*Id.*, at p. 333.)

More recently, in *Calfarm, supra*, 48 Cal.3d 805, we held unconstitutional a key provision of Proposition 103, a measure designed to institute insurance reform. The challenged provision illegally precluded rate adjustments necessary to allow the insurer a fair rate of return. We concluded the invalid provision was severable from the balance of the measure: The "remainder of the initiative . . . would likely have been adopted by the people had they foreseen the invalidity of the [provision illegally restricting rate adjustments]. The voters who enacted Proposition 103 would presumably prefer rate setting and regulation under the balance of the initiative to the method of setting insurance rates which existed before the initiative was enacted. There is no persuasive reason to suppose the [invalid provision] was so critical to the enactment of Proposition 103 that the measure would not have been enacted in its absence." (48 Cal.3d at p. 822; see also *Legislature v. Eu* (1991) 54 Cal.3d 492, 534-535 [286 Cal.Rptr. 283, 816 P.2d 1309] [severing invalid pension limitation from initiative measure]; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 355-356 [276 Cal.Rptr. 326, 801 P.2d 1077] [severing invalid constitutional revision from initiative measure].)

With these examples of severability analysis in mind, we turn to the essential question posed in this case: Has Proposition 73 been "invalidated" by the federal injunction against enforcement of the contribution limitation provisions of that measure?

### B. *The ban on publicly funded mass mailings*

Although petitioners and amici curiae on behalf of respondents focus their briefing predominantly on whether section 85300 (the ban on public financing of election campaigns) is severable from the enjoined provisions of Proposition 73, and although we suggested in *Johnson v. Bradley* (1992) 4 Cal.4th 389, 401 [14 Cal.Rptr.2d 470, 841 P.2d 990], that we would address that question in this litigation, on further review we find it unnecessary to do so in order to resolve petitioners' claim.

As noted above, in *Taxpayers, supra*, 51 Cal.3d at page 771, footnote 13, we left undecided "whether an initiative measure that has no effect at the

time it is adopted because it is superseded by another measure adopted by a larger vote at the same election becomes effective *if the latter is subsequently invalidated. . . .*" (Italics added.) As a predicate to their claim that all or part of Proposition 68 should be revived, petitioners must establish that Proposition 73 has been *"invalidated,"* i.e., that no substantial part of the measure remains effective. If *any substantial part* of Proposition 73 remains effective despite the federal injunction, petitioners' claim of revival of Proposition 68, in whole or in part, must fail.

It follows that we need not decide the viability of each remaining section of Proposition 73 in order to resolve petitioners' writ application; we can resolve this litigation by finding that at least *one substantial part* of Proposition 73 is severable and operative. As explained below, the section that most clearly and easily meets this requirement is section 89001, the ban on publicly funded mass mailings. Accordingly (and because, as explained above, petitioners' claim must fail if *any substantial part* of Proposition 73 survives), we proceed to consider whether section 89001 is severable from the invalidated provisions under the analysis set out in *Santa Barbara, supra,* 13 Cal.3d 315, and its progeny.

As noted above, petitioners concede section 89001's ban on public funding of mass mailings is gramatically and functionally separate from the contribution limits enjoined by the federal courts. The question is whether the ban is also volitionally separate from the enjoined provisions. We conclude it is.

Because Proposition 73 contains no express policy statement or declaration of purpose, we must look to the initiative measure's text and the ballot materials for guidance concerning whether the ban on publicly funded mass mailings was presented to the voters as something separate and distinct from the contribution limits, so that its "significance may be seen and independently evaluated in the light of the assigned purposes of the enactment." (*People's Advocate, Inc.* v. *Superior Court, supra,* 181 Cal.App.3d at p. 333.) We begin by reviewing the official statements made to the voters about Proposition 73. (*Taxpayers, supra,* 51 Cal.3d at p. 749, fn. 5.)

The ban on publicly funded mass mailings was separately highlighted for the voters as one of the goals that would be met by passage of Proposition 73. The "Official Title and Summary Prepared by the Attorney General" stated: "CAMPAIGN FUNDING. CONTRIBUTION LIMITS. PROHIBITION OF PUBLIC FUNDING INITIATIVE STATUTE. Limits annual political contributions to a candidate for public office . . . . Permits stricter local limits. Limits gifts and honoraria to elected officials . . . . Prohibits transfer of funds between

candidates or their controlled committees. *Prohibits sending newsletters or other mass mailings, as defined, at public expense.* Prohibits public officials using and candidates accepting public funds for purpose of seeking elective office. . . . ." (Ballot Pamp., Prop. 73, Primary Elec. (June 7, 1988) p. 32, italics added.)

Thereafter the Legislative Analyst specifically listed the ban on publicly funded mass mailings as one of the three main goals of the initiative: "In summary, this measure: [¶] • Establishes limits on campaign contributions for all candidates for state and local elective offices; [¶] • Prohibits the use of public funds for these campaign expenditures; and [¶] • Prohibits state and local elected officials from spending public funds on newsletters and mass mailings." (Ballot Pamp., Prop. 73, Primary Elec., *supra*, p. 32.) The analyst described the primary provisions of the measure, and again highlighted the ban on publicly funded mass mailings: "Newsletters and Mass Mailings [¶] Public funds cannot be used by state and local elected officials to pay for newsletters or mass mailings." (*Ibid.*)

Finally, the analyst emphasized the anticipated savings that would result from the ban on publicly funded mass mailings. In a passage entitled "Fiscal Effect," the voters were told that increased administrative costs associated with the measure ("about $1.1 million a year") would be offset by "annual savings of about $1.8 million resulting from the prohibition on the expenditure of public funds for newsletters and mass mailings. [¶] Local government agencies would also experience unknown annual savings. These savings would result primarily from the prohibition on public expenditures for newsletters and mass mailings." (Ballot Pamp., Prop. 73, Primary Elec., *supra*, p. 33.)

The text of the measure followed, divided into four sections. Nothing therein suggests that the ban on publicly funded mass mailings is dependent on the existence of the enjoined contribution limitations, or any other provision of the measure. (Ballot Pamp., Prop. 73, Primary Elec., *supra*, pp. 33 & 63.) Section 1 established, inter alia, the contribution limitations enjoined by the federal courts. Section 4 set out the severability clause quoted, *ante*, at page 714. Sections 2 and 3 concerned mass mailings.

Section 2 of Proposition 73 amended Government Code section 82041.5 to expand the definition of "mass mailing."[9] Section 3 amended Government Code section 89001 to flatly preclude publicly funded newsletters or mass mailings: "No newsletter or mass mailing shall be sent at public expense."

---

[9]The provision read: "SEC. 2. Section 82041.5 of the Government Code is amended to read: [¶] 82041.5. "Mass mailing" means two hundred or more identical or nearly identical *substantially similar* pieces of mail, but does not include a form letter or other mail which is

The ballot arguments followed. (Ballot Pamp., Prop. 73, Primary Elec., *supra*, pp. 34-35.) As petitioners note, the debate focused on the relative merits of the competing campaign contribution reform schemes offered to the voters in Propositions 73 and 68, with specific emphasis on the wisdom of committing public money to fund election campaigns. The arguments did not expressly address the proposed public funding ban on mass mailings.

Viewing the ballot materials as a whole, we conclude the ban on publicly funded mass mailings was sufficiently highlighted "to identify it as worthy of independent consideration." (*People's Advocate, Inc.* v. *Superior Court*, *supra*, 181 Cal.App.3d at p. 333.) We can "sa[y] with confidence that the electorate's attention was sufficiently focused upon the [ban on public funding of mass mailings] so that it would have separately considered and adopted [that ban] in the absence of the [enjoined] portions." (*Ibid.*) As we noted in *Santa Barbara, supra*, 13 Cal.3d at pages 331-332, "Even though . . . the full purpose of Proposition [73] cannot be realized, it seems eminently reasonable to suppose that those who favor the proposition would be happy to achieve at least some substantial portion of their purpose, namely to eliminate" public funding of mass mailings. (See also *City of Woodlake* v. *Logan* (1991) 230 Cal.App.3d 1058, 1070 [282 Cal.Rptr. 27] ["[a]lthough the [invalid] provisions . . . may have been the heart of Proposition 62, some substantive provisions remain," and should be enforced in order to effectuate the voters' intent].)

It follows that section 89001 remains effective despite (and regardless of) the federal injunction against enforcement of Proposition 73's campaign contribution provisions. It is also clear that, although the ban on public funding of mass mailings was not the "heart" or "dominant purpose" of the measure, it was a substantial feature of the initiative. Accordingly, petitioners cannot show that, by reason of the federal injunction, Proposition 73 has been "invalidated." (*Taxpayers, supra*, 51 Cal.3d at p. 771, fn. 13.) Hence, there is no reason to reevaluate our holding of *Taxpayers*, that Proposition 73 was enacted and that Proposition 68—a competing, alternative statutory scheme that was simultaneously passed by a lesser number of affirmative votes—is inoperative.[10]

sent in response to a̶ *an unsolicited* request, letter or other inquiry." (Ballot Pamp., Prop. 73, Primary Elec., *supra*, at p. 63, italics and strike-through type in original.)

[10]The dissent simply ignores, and hence gives no effect to, the severability clause contained in Proposition 73. Indeed, under the approach embraced by the dissent, all of the provisions of Proposition 73 not subject to the federal injunction would be invalidated even if that initiative had been the sole campaign reform measure before the voters in 1988. Our cases require that we afford more respect to a legitimate severability clause. (See, e.g., *Calfarm*, *supra*, 48 Cal.3d at p. 821.)

## C. *Continued viability of Taxpayers holding*

■ Petitioners suggest, nevertheless, that the factual premise that underlies *Taxpayers, supra,* 51 Cal.3d 744—namely, that Propositions 73 and 68 were competing, alternative statutory schemes—has been undermined by the federal injunction. They assert that even if Proposition 73's remaining provisions are *all* severable, the measure has been so diluted that it would no longer constitute a competing, alternative statutory scheme, as compared with Proposition 68, and hence article II, section 10, subdivision (b) of the state Constitution should be read to require the courts to merge the nonconflicting parts of the two measures. (See *Yoshisato* v. *Superior Court* (1992) 2 Cal.4th 978, 987-988 [9 Cal.Rptr.2d 102, 831 P.2d 327] [merging two noncompeting initiative measures].)

We reject petitioners' assertion that the factual premise of *Taxpayers* has been undermined by events occurring after the June 1988 election. The rule articulated in *Taxpayers, supra,* 51 Cal.3d at page 765, looks to the nature of the measures *as they were presented to the voters.* We took the same approach in *Yoshisato* v. *Superior Court, supra,* 2 Cal.4th 978, 987-988; in that case we interpreted the Constitution as requiring merging of two measures that were "*presented to the voters* as complementary or supplementary (i.e., noncompeting) measures." (2 Cal.4th at p. 988, italics added.) In neither case did we suggest that events subsequent to the election might be considered to alter the nature of the conflicting measures in a later challenge. Indeed, such an approach would be unworkable, and would produce potential uncertainty that could not have been intended by the drafters of article II, section 10, subdivision (b) of the Constitution. Accordingly, we reject the suggestion that the federal injunction has transformed Propositions 73 and 68, nunc pro tunc, from alternative, competing measures that cannot be merged, into complementary, supplementary measures that must be merged.

## III. *Conclusion*

Petitioners' application for a writ of mandate is denied. Accordingly, intervener's demurrer is overruled as moot.

George, J., concurred.

**BAXTER, J.,** Concurring.—"Although the legislative power under our state Constitution is vested in the Legislature, 'the people reserve to themselves the powers of initiative and referendum.' (Cal. Const., art. IV, § 1.) Accordingly, the initiative power must be *liberally construed* to promote the democratic process. (*Raven* v. *Deukmejian* [(1990) 52 Cal.3d 336,] 341 [276

Cal.Rptr. 326, 801 P.2d 1077].) Indeed, it is our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise. (*Ibid.*, and cases cited.) As with statutes adopted by the Legislature, all presumptions favor the validity of initiative measures and mere doubts as to validity are insufficient; such measures must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citation.]" (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 500-501 [286 Cal.Rptr. 283, 816 P.2d 1309], italics in original.)

While it might be possible for us to remedy the perceived constitutional defect of Proposition 73's campaign contribution limit provisions by exercising our judicial power to reform the statutory language,[1] we have not been asked to do so by the parties, the intervener or amici curiae herein. Whether or not we will be asked to consider such a course in the future remains to be seen. Accordingly, our opinion today does not attempt to effectuate the full reach of the electorate's will, but endeavors to uphold its will by finding that Proposition 73 remains effective in substantial part.

Although I concur in the majority's result, I write separately to express my view that Proposition 73's ban on the public financing of election campaigns is also severable from the enjoined contribution provisions.

When provisions of an initiative statute are constitutionally or otherwise invalid, the void provisions must be stricken from the statute but the remaining valid provisions should be given effect if they are severable. (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 330-331 [118 Cal.Rptr. 637, 530 P.2d 605]; see *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 821, 836 [258 Cal.Rptr. 161, 771 P.2d 1247].) "[I]n considering the issue of severability, it must be recognized that the general presumption of constitutionality, fortified by the express statement of a severability clause, normally calls for sustaining any valid portion of a statute unconstitutional in part." (*In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892].) An express statement of severability generally imposes on the courts the duty of sustaining the electorate's will as far as possible. (Cf. *In re Application of Schuler* (1914) 167 Cal. 282, 289 [139 P. 685].)

California cases prescribe three criteria for severability: (1) the invalid provision must be mechanically and grammatically separable; (2) it must be functionally separable; and (3) it must be volitionally separable. (*Calfarm Ins. Co.* v. *Deukmejian, supra*, 48 Cal.3d at pp. 821-822.) With regard to the third criterion, severability " 'depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had

---

[1]Alternatively, the Legislature might consider amending the contribution provisions.

the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable.' [Citations.]" (*Id.*, at p. 821.) Utilizing this test, I have no hesitancy concluding that had the electorate known that Proposition 73's contribution limits might be held invalid, it nonetheless would have supported the proscription on public financing.

Significantly, the ballot materials accompanying Proposition 73 did not present the contribution limits as its one basic reform. Both the official title and summary prepared by the Attorney General and the analysis by the Legislative Analyst make clear that the initiative proposed to accomplish several election financing reforms, two of which consisted of limiting campaign contributions and prohibiting public funding of campaigns. These official summaries did not imply that the contribution limits comprised the measure's central purpose, nor did they indissolubly link the limits to the public financing ban or any other proposed action.

The Attorney General's summary of Proposition 73, located prominently at the beginning of the ballot materials concerning the proposition, informed voters in unmistakable terms that the measure proposed a number of reforms. It briefly summarized many of these reforms, listing them in the following order: campaign contribution limitations, limitations on gifts and honoraria to elected officials, prohibition of newsletters and mass mailings at public expense, prohibition of public funding for officials and candidates seeking elective office. The descriptions of the public financing ban and the campaign contribution limits were thus separated by descriptions of other reforms, and neither referred to the other.

Similarly, the Legislative Analyst's analysis of the measure informed the electorate that Proposition 73: "[¶] • Establishes limits on campaign contributions for all candidates for state and local elective offices; [¶] • Prohibits the use of public funds for these campaign expenditures; *and* [¶] • Prohibits state and local officials from spending public funds on newsletters and mass mailings." (Italics added.) The analysis subsequently described each of these proposed reforms, but nowhere promoted them as one indivisible idea.

Additionally, although some of the ballot arguments for and against Proposition 73 linked the campaign contribution limits with the public financing ban, most of the supporting arguments emphasized, without making a connection between the two, that the measure would prohibit politicians and special interest groups from using tax money to run their campaigns. The supporters also warned voters that a state matching fund

program would be costly, and argued that "TAXPAYERS SHOULD NOT BE FORCED TO SHELL OUT UP TO $70 MILLION EVERY TWO YEARS FOR THEIR EXTRAVAGANT PLAN." Thus, the public financing ban was promoted both as a vital part of Proposition 73 and as the principal distinguishing feature between that initiative and Proposition 68. In my view, it was this ban which resulted in the electorate giving the greater majority to Proposition 73, and the consequent defeat of Proposition 68's alternative reforms based largely on public funding.

The dissent disagrees, concluding that the electorate would not have voted to enact the public financing ban without the contribution limits. (Dis. opn. of Arabian, J., *post*, at pp. 731-734.) The dissent argues first that the two provisions were indissolubly linked in the electorate's mind. (*Id.*, at pp. 731-732.) It additionally points to the fact that California has no law permitting the use of public funds to finance political campaigns. (*Id.*, at pp. 732-733.) In the dissent's view, because the proposed public financing ban was not a "reform" of any existing practice, it is unlikely that the electorate's desire for reform would be satisfied by a measure that simply preserved the status quo. (*Ibid.*)

These are flawed arguments. First, as indicated above, the ballot materials described Proposition 73 as offering a number of separate campaign financing reforms, including contribution limits, a ban on the public financing of campaigns, restrictions on gifts and honoraria to elected officials, *and* the prohibition of newsletters and mass mailings at public expense. If anything, it may reasonably be inferred from the ballot arguments that it was the public financing ban, not the campaign contribution limits, that was the centerpiece of the initiative.

Second, it is incorrect to assume that the electorate would not have enacted the public financing ban merely because the public financing of campaigns had never previously been authorized under California law. The analysis by the Legislative Analyst informed voters: "California law does not generally permit any public money to be spent for campaign activities. A few local government agencies, however, have authorized the payment of public matching funds to candidates for local offices." After providing this background, the analysis explained that Proposition 73 would prohibit the use of public funds by any candidate for public office. From this analysis and the other ballot materials, the electorate could reasonably understand that the initiative sought to reform these local campaign financing practices, and to affirmatively prevent the authorization of any future public financing at the state level (indeed, as Proposition 68 proposed to do). Thus, regardless of whether or not public financing had been authorized in the past, Proposition 73 sought to assure that such financing would not be permitted in the

future. I have no trouble concluding that the electorate would nevertheless have voted for the ban had it foreseen the invalidity of the campaign contribution limits.[2]

Finally, I believe the passage of Proposition 68 deserves little weight in ascertaining the electorate's will with respect to Proposition 73's severability. As we recognized in *Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 760 [274 Cal.Rptr. 787, 799 P.2d 1220], "[t]hat some voters would have been satisfied with the adoption of either proposition does not suggest that they wanted both, *or that the same voters cast a majority of the affirmative votes for each initiative.*" (Italics in original, fn. omitted.) Therefore, while campaign contribution limits were a part of both measures, that fact does not lead logically to the conclusion that the people who voted for Proposition 73 regarded such limits as the central purpose of the measure, or that they would prefer contribution limits *with* public funding to no limits at all.[3]

In sum, I believe Proposition 73's public financing ban is mechanically, functionally and volitionally separable from the invalid contribution limits. I therefore concur in the majority's conclusion that Proposition 68 remains inoperative.

Panelli, J., concurred.

**ARABIAN, J.,** Dissenting.—An attachment to the principle of popular sovereignty has been one of the hallmarks of this court's jurisprudence. Yet

---

[2]The dissent cites *Johnson* v. *Bradley* (1992) 4 Cal.4th 389, 410-411 [14 Cal.Rptr.2d 470, 841 P.2d 990], out of context. (Dis. opn. of Arabian, J., *post*, at p. 734.) That case involved a local measure, approved by a majority of the local voters of the City of Los Angeles, which provided for partial public financing of municipal elections by local taxes. There we decided that the locally enacted measure prevailed over the public financing ban contained in Proposition 73 under the home rule provision of the California Constitution (art. XI, § 5). Thus, the discussion quoted by the dissent herein was relevant to the issue whether Proposition 73's ban was reasonably related to the statewide concern of enhancing the integrity of the electoral process. (See *Johnson* v. *Bradley, supra,* 4 Cal.4th at pp. 409-411.) In no manner, however, did our discussion in that case even purport to speak to the issue of severability regarding Proposition 73.

[3]The dissent attempts to impeach this conclusion with evidence of an exit poll survey taken by the Los Angeles Times. (Dis. opn. of Arabian, J., *post*, at p. 733.) There are several good reasons, however, for rejecting this evidence as a basis for ascertaining the voters' intent. First and foremost, the evidence is not a part of the record in this case; nor is it a proper subject for judicial notice (see Evid. Code, §§ 451, 452, 459). Second, while poll results might have some usefulness in certain contexts (see *Moore* v. *California State Board of Accountancy* (1992) 2 Cal.4th 999, 1015-1017 [9 Cal.Rptr.2d 358, 831 P.2d 798]), they can be "notoriously inaccurate" (see *id.,* at p. 1027, dis. opn. of Mosk, J.), especially where, as here, the reliability of the particular evidence has not been tested or established.

it is that very principle that the majority breach in declaring that the clear desire of the voters to impose real controls on the stream of money corroding our political life—a desire expressed not once, but *twice in the same election*—has produced what? Little more than a ban on officeholders' use of their mailing privileges. I dissent from a result that reduces to such an anemic state the exercise of the powers of initiative and referendum reserved to the people by article IV, section 1 of our Constitution.

The majority's conclusion that insignificant features of Proposition 73 can be severed from the central purpose of the initiative is flawed. Appraised in light of its dominant purpose, it is plain that those who supported the measure would not have settled for a ban on mailing privileges, a truly trifling "reform," had they foreseen the total frustration of their overriding aim in passing the initiative—imposing limits on campaign contributions, a goal now permanently enjoined by a judgment of the federal courts.

Moreover, Proposition 73's ban on public funding is inseparably linked to the invalid contribution limits; it cannot stand alone either. In Justice Mosk's piquant phrase, Proposition 73 "was offered to the voters as a package deal, and not a smorgasbord" (*Johnson* v. *Bradley* (1992) 4 Cal.4th 389, 420 [14 Cal.Rptr.2d 470, 841 P.2d 990] (conc. & dis. opn. of Mosk, J.)); invalidating its animating purpose invalidates all of Proposition 73. Under these circumstances, judicial duty and a realistic appraisal of the voters' intentions require us to hold that Proposition 68, the competing campaign reform initiative, should now take effect. The alternative, as represented by the majority, eviscerates the only real chance at reforming the link between money and politics that the voters of California have had in a generation.

I

A

The essentials of the severability doctrine were formulated by Lemuel Shaw almost 150 years ago; in their rationale and simplicity they are virtually unchanged today. In *Warren* v. *Mayor of Charlestown* (1854) 68 Mass. [2 Gray] 84, the Chief Justice wrote that if the valid and invalid parts of a statute "are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them." (*Id.* at p. 99.)

Statements of the doctrine often include a requirement that the part of the law to be severed must be "mechanically" capable of separation. Later cases

have elaborated on this requirement, dividing it into two parts, grammatical and functional. (See, e.g., *Calfarm Ins. Co.* v. *Deukemjian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 101, 771 P.2d 1247] [*Calfarm*].) But these refinements are not the essentials: "The final determination depends on whether 'the remainder . . . would have been adopted by the [lawmaker] had [it] foreseen the partial invalidation of the statute.' " (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605] [*Santa Barbara*], quoting *In re Bell* (1942) 19 Cal.2d 488, 498 [122 P.2d 22].) Above all else, underlying every formulation, issues of severability are questions of the lawmaker's *intent.*

In purporting to glean the intent of those who voted for Proposition 73, the majority lean heavily on the statement of the Court of Appeal in *People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 333 [226 Cal.Rptr. 640] (*People's Advocate*), that "[t]he test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." Given the nature of the ballot proposition at issue in that case, I have no quarrel with the Court of Appeal's formulation. Because the task of a court dealing with a severability problem is to approximate the presumed intent of the lawmaker had it known that the law was partly invalid, it makes sense to suppose that, as Judge Thomas Cooley put it in his famous treatise, first published in 1868, "[i]f a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other." (1 Cooley's Constitutional Limitations (8th ed. 1927) ch. VII, p. 362; see also Stern, *Separability and Separability Clauses in the Supreme Court* (1937) 51 Harv.L.Rev. 76, 81.)

Our decision in *Santa Barbara, supra,* 13 Cal.3d 315, the principal authority invoked in *People's Advocate, supra,* 181 Cal.App.3d 316, to fortify its severability analysis, is an even clearer example of the type of measure which seeks to "accomplish two or more objects." There, a majority of the voters approved Proposition 21, a measure purporting to achieve two goals: "enact[ ] anti-busing legislation and repeal[ ] existing [state] statutes dealing with the prevention and elimination of racial and ethnic imbalance in pupil enrollment." (13 Cal.3d at p. 319.) Despite our holding that the antibusing features of the initiative were unconstitutional, we severed the initiative's corollary feature—the elimination of a state commitment to school integration independent of constitutional requirements—against a claim that it was inseparably related to the unconstitutional provision.

Although the twin purposes of Proposition 21 could not be enacted, we said that the initiative "reflect[ed] separable methods of achieving [an

overall] purpose" (13 Cal.3d at p. 331) and reasoned that "those who favor the proposition would be happy to achieve at least some substantial portion of their purpose." (*Id.* at p. 332.) It is that statement that the majority seize on as somehow clinching its view that the ban on the use of the frank survives the judicial nullification of the heart of Proposition 73.

While our reasoning and the result we reached in *Santa Barbara, supra,* 13 Cal.3d 315, are sound, I cannot embrace the view that what we characterized in that case as a "substantial portion of [the voters'] purpose"—achieving one of the two independent objects of an initiative—has any bearing at all on this case. To say that those who thought they were voting for far-reaching and substantial reform of the connection between money and politics in California's political life would be "happy" to settle for a ban on the use of mass mailing privileges not only grossly overestimates the significance of a minor feature of Proposition 73, but also applies the wrong analytical model in resolving the severability issue in this case.

If a measure seeks "to accomplish two or more objects," it is reasonable to insist that "the provisions to be severed must be so presented to the electorate in the initiative that their significance may be seen and independently evaluated in the light of the assigned purposes of the enactment." (*People's Advocate, supra,* 181 Cal.App.3d at pp. 332-333.) That test is a sensible one when applied to measures with multiple aims because it helps to assure the court that "sufficient attention was drawn" to the valid part of the measure "to identify it as worthy of *independent* consideration" in the collective mind of the electorate. (*Id.* at p. 333, italics added.) But the test is not exhaustive and, because it presupposes that the remainder of the law is not inseparably linked in the minds of the voters to the invalid part, it can yield unreliable results when applied to differently structured measures. It certainly does so in this case.

B

Although we apply a "substantial purpose" test where a measure seeks to enact two or more goals that can be independently realized, measures that have a *central* or inducing purpose evoke a test with a different emphasis. In these cases, we have applied what might be called a "dominant purpose" test to reach the touchstone of severability—"whether the remainder . . . would have been adopted by the [lawmaker] had [it] foreseen the partial invalidation of the statute." (*Santa Barbara, supra,* 13 Cal.3d at p. 331.) The reason for framing the test in this way is prominent on the surface of the earliest formulations of the severability doctrine. As Judge Cooley put it, ". . . if [a law's] purpose is to accomplish a single object only, and some of its

provisions are void, the whole must fail unless *sufficient remains to effect the object without the aid of the invalid portion.*" (1 Cooley's Constitutional Limitations, *supra*, ch. VII, p. 362, italics added, fn. omitted.)[1]

More often than not, the cases in which this court has applied a dominant purpose test have been ones in which we concluded that the invalid part was *not* central to the overall object of the statute, thus allowing us to save the remainder as severable. In at least one recent case, however, we concluded that the invalidity of the central purpose of a measure destroyed its basic rationale and prevented severance. In *Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180 [185 Cal.Rptr. 260, 649 P.2d 902] (*Metromedia*), we applied a dominant purpose analysis to a city ordinance that banned off-site billboard advertising. After the high court concluded that San Diego's ban on noncommercial billboards was invalid on First Amendment grounds, we considered whether the remainder of the ordinance could be severed. We concluded that although the unconstitutional portion was mechanically separable, the result "would take a strange form." (*Id.* at p. 190.) Because the city's ban on off-site billboard advertising was intended to be comprehensive and that goal would be frustrated without the invalid portion, we held the entire ordinance facially invalid. It was "doubtful," we said, "whether the purpose of the original ordinance is served by a truncated version limited to commercial signs." (*Id.* at p. 190.)

In one of our frequently cited recent applications of the severability doctrine, *Calfarm, supra*, 48 Cal.3d 805, we invalidated the insolvency standard of Proposition 103, the automobile insurance rate rollback initiative, on the ground that it was confiscatory. We left standing the remainder of the measure, not because of assurances that the attention of the voters had been sufficiently focused, but because there was "no persuasive reason to suppose the insolvency standard was *so critical* to the enactment of Proposition 103 that the measure would not have been enacted in its absence." (*Id.* at p. 822, italics added.)

---

[1] The "dominant purpose" formulation harkens back to some of the earliest opinions of this court dealing with severability problems. In *Hale* v. *McGettigan* (1896) 114 Cal. 112, 119 [45 P. 1049], we said that severability issues turn on "the nature of the different provisions in view of the evident purpose of the legislature. If the provisions are so interdependent that those which are invalid are to be regarded as the condition or consideration upon which others were enacted, and it is evident that the legislature would not have enacted the statute except in its entirety, and did not intend that any part should have effect unless the whole could be made operative, the entire statute must be held invalid." In *Bacon Service Corporation* v. *Huss* (1926) 199 Cal. 21, 32 [248 P. 235], we used a similar formula, noting that "if the objectionable portions of an act are so connected with the rest of the act as to be inseparable . . . the entire act must fall." And in *In re Portnoy* (1942) 21 Cal.2d 237, 242 [131 P.2d 1], we again invoked the relation between the parts of a measure, observing that "where the invalid portions of the statute are so connected with the rest of the statute as to be inseparable, . . . the entire act must fall."

We also held the measure's tax adjustment provision invalid but severed it from the remainder because the dominant purpose of the initiative could still be achieved: "Proposition 103 was enacted to make insurance more available and affordable, not to increase or stabilize revenues. . . . The deletion of [the tax adjustment] provision will not hamper the achievement of the initiative's stated purpose," we said, and "the removal of [the invalid provision] permits the supporters to achieve all of their stated objectives." (*Calfarm, supra*, 48 Cal.3d at pp. 840-841, fn. omitted.)

In *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1] (*Sonoma County*), we used similar language and a similar emphasis. At issue there was a comprehensive statutory plan to alleviate the fiscal problems of local agencies caused by the passage of Proposition 13 by distributing to local agencies $5 billion in surplus state funds. We held invalid a provision of the plan barring the distribution of funds to agencies that had granted cost of living increases to employees above a specified level. The remainder of the measure was severable, however, in light of its dominant purpose. "The invalid provisions constitute only a minute portion of a lengthy, detailed, and comprehensive measure designed to afford fiscal relief to local agencies by the distribution of the state surplus . . . ," we wrote, and "[t]he basic objective of the rescue plan" would be furthered by our conclusion that "the unconstitutionality of the provisions challenged in these proceedings does not invalidate the entire legislative design." (*Id.* at p. 320.)

In *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403] (*Cooper*), we considered a taxpayer challenge to a resolution of a local school board setting teacher salaries. Although we found that the bulk of the resolution passed constitutional muster, we invalidated a provision granting employees veto power over board decisions. Despite the taxpayers' claim that the veto provision was inseparable from the remainder and tainted the entire resolution, we found it "clearly severable" because we had "little doubt that the school board did not consider the private 'veto' power such an inseparable part of the resolution that it would have declined to enact the resolution in its absence." (*Id.* at p. 931.)

Our language in *Metromedia, supra*, 32 Cal.3d 180, *Calfarm, supra*, 48 Cal.3d 805, *Sonoma County, supra*, 23 Cal.3d 296, and *Cooper, supra*, 13 Cal.3d 898, is not the language of "substantial purpose." In resolving the severability issues presented in those cases, we did not look to the organization of the measure for evidence that the lawmaker's attention was "sufficiently focused" on the remainder as worthy of independent enactment, or ask whether it would have been "happy to achieve . . . some substantial portion" of its aims.

Instead, we asked "whether the *purpose* of the [measure] is *served*" by severance (*Metromedia, supra*, 32 Cal.3d at p. 190), whether the invalid part of the measure was "*so critical*" to the lawmaker's purpose (*Calfarm, supra*, 48 Cal.3d at p. 822), whether its deletion would "hamper the achievement of the [measure's] *stated purpose*" (*id.* at p. 841), whether "*all* of [the] stated *objectives*" could yet be achieved (*ibid.*), whether the invalid provisions were "only a *minute portion* of a lengthy, detailed, and comprehensive measure," and whether "the *basic objective*" or the "*entire legislative design*" of the measure would be compromised by the deletion of the invalid portion (*Sonoma County, supra*, 23 Cal.3d at p. 320). Above all, we inquired whether it was reasonable to conclude that the lawmaker would have regarded the invalid portion as "such an inseparable part" of the measure that it "would have declined to enact the [law] in its absence." (*Cooper, supra*, 13 Cal.3d at p. 931.) That is the approach we ought to take in this case.

## C

It is obvious that the dominant, indeed, the inducing purpose of Proposition 73, was to enact a "comprehensive regulatory scheme" that would limit political contributions to candidates for public office. (*Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 747 [274 Cal.Rptr. 787, 799 P.2d 1220] [*Taxpayers*].) One need only read our account of the ballot materials in *Taxpayers*, or the text of the measure itself, to grasp this fundamental fact. Checking the flow of campaign funds was *the* central purpose of the measure, the core rationale animating a majority of voter support in the June 1988 Primary Election. Without that purpose—and there is no mistaking that the final judgment of a federal court has permanently enjoined enforcement of *all* of Proposition 73's regular election campaign contribution and transfer limits—the overriding objective of the voters who supported the measure *cannot be achieved.*

To apply in such a context and to such a measure a test fashioned to confirm voter awareness of *independent* provisions of a law—severing virtually the entire operational part of an initiative represented as achieving a broad reform of political campaign financing, leaving standing a ban on *mailing privileges*—on the ground that the voters would "be happy to achieve at least some substantial part of their purpose," yields a result that is intuitively unsound. It ignores the central truth of the 1988 political reform campaign and, with all respect, substitutes in its place a kind of "logic chopping." Because these minor and supplementary features of Proposition 73—the ban on officeholders' mass mailing privileges and contribution limits for special elections—are peripheral to the initiative's central objective, and because the federal injunction against enforcement of the measure's

limitations on campaign contributions completely thwarts its overriding purpose; these elements of the measure are not severable under any rational estimate of the voters' intent.[2]

## II

Although the majority find it unnecessary to decide the issue, I would take up the additional question whether Proposition 73's ban on the use of public funds to finance political campaigns can be severed from its unenforceable limits on campaign contributions. The argument that Proposition 73's ban on public financing has significance independent of its linkage to the initiative's contribution limits is derived from the fact that, although both of the competing campaign finance reform measures passed at the June 1988 Primary Election, more people voted for Proposition 73 than voted for its rival. That priority in voter preferences is said to support an inference that the electorate's real desire was for extensive reform of campaign financing *without* the use of public funds. That is true, of course, but it proves little in this case.

Proposition 68, after all, was not defeated, it was only rendered "inoperable" under the "winner-take-all" construction of article II, section 10, subdivision (b) (section 10(b)) of the Constitution that we adopted in *Taxpayers, supra*, 51 Cal.3d at page 770. The voters thus demonstrated their approval of a financing reform measure that limits campaign contributions *without* the use of public funds (Proposition 73) *and* one that limits campaign contributions *with* the use of public funds (Proposition 68). It is also true that, because more voters approved Proposition 73 than approved its rival, we can assign relative strengths to the voters' preference: First, they wanted reform without the use of public funds. Failing that, they wanted reform with

---

[2]The majority opinion chides us by suggesting that we ignore the severability clause in Proposition 73, noting that our "cases require that we afford more respect to a legitimate severability clause." (Maj. opn., *ante*, at p. 719, fn. 10.) This is not the place to trace the curious, even paradoxical, history of the ubiquitous severability clause which, as Sutherland has it, "is regarded as little more than a mere formality." (2 Sutherland, Statutory Construction (5th ed. 1992) § 44.08, p. 521.) It is enough to note that, under our cases, "[s]uch a clause plus the ability to mechanically sever the invalid part while normally *allowing* severability, *does not conclusively dictate it*. The final determination depends on whether 'the remainder . . . is complete in itself and would have been adopted by the [lawmaker] had the latter foreseen the partial invalidation of the statute' [citation] or 'constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable.' [Citation.]" (*Santa Barbara, supra*, 13 Cal.3d at p. 331, italics added; see also *Calfarm, supra*, 48 Cal.3d at p. 821 [same]; *Metromedia, supra*, 32 Cal.3d at p. 190 [same; refusing severance despite a clause].) In other words, although such clauses *permit* a court to sever the invalid portions, they do not *mandate* it; the touchstone remains the intent of the lawmaker as it is gleaned through the application of commonsense principles of construction.

limited public funding. Unquestionably, they wanted reform over no reform at all.

It makes little sense to argue, as do some amici curiae, that what the voters "really" would have chosen, had they foreseen the invalidity of the contribution limits of Proposition 73, was Proposition 68 *and* the fragmented ban on the use of public funds left following the nullification of Proposition 73's contribution limits. Because no creature remotely resembling such a proposition was presented to the voters, it is bootless speculation to imagine the outcome of such a contest.

That the voters were asked to choose between competing "package deals" *and* that the ban on the use of public funds was inseparably tied to Proposition 73's campaign contribution limits is not speculation, however, because the ban on public funding was *the* principal feature that distinguished Proposition 73 from its rival, Proposition 68. *"Proposition 73 will reform the way political campaigns are financed in California* WITHOUT GIVING YOUR TAX MONEY TO POLITICIANS!" trumpeted the opening sentence of the ballot argument (Ballot Pamp., argument in favor of Prop. 73 as presented to the voters, Primary Elec. (June 7, 1988) p. 34.). Later in the ballot argument, the measure's sponsors promised that "PROPOSITION 73 ACCOMPLISHES . . . NEEDED REFORM OF CAMPAIGN FINANCING WITHOUT GIVING YOUR HARD-EARNED TAX MONEY TO POLITICIANS. [¶] . . . [¶] TAXPAYER FINANCING OF POLITICAL CAMPAIGNS MAKES NO SENSE! [¶] . . . [¶] *Fortunately, you have an alternative to taxpayer financing of political campaigns.* [¶] PROPOSITION 73 IS THAT ALTERNATIVE." (*Ibid.*, italics in original.)

Moreover, it is clear from the very title of Proposition 73 that the ban on public financing was indissolubly linked to limits on campaign contributions. As petitioners point out, the connection between contribution limits and the ban on public financing is neither conjunctive nor disjunctive, it is *relational.* The proponents of Proposition 73 did not promise the voters "campaign contribution reform *and* no public financing." Instead, they promoted, in opposition to the rival measure, one indivisible idea, "Campaign Contribution Limits *Without* Taxpayer Financing." The notion that the electorate would have enacted a measure, pitched by its sponsors as delivering what a majority of voters indisputably wanted—and without taxpayer expense—that in the end has *no* valid limits on campaign contributions *at all* is even more unlikely considering the fact that California had no law permitting the use of public funds to finance political campaigns. In other words, standing alone, a ban on public financing would have represented no "reform" at all.

In his concurring opinion, Justice Baxter relies on the statement in *Taxpayers*, *supra*, 51 Cal.3d at page 760, that the fact that "some voters would have been satisfied with the adoption of either proposition [68 or 73] does not suggest that they wanted both, or that the same voters cast a majority of the affirmative votes for each initiative." (Italics & fn. omitted.) From this, he infers that the fact that "campaign contribution limits were a part of both measures . . . does not lead logically to the conclusion that [those] who voted for Proposition 73 regarded such limits as the central purpose of the measure, or that they would prefer contribution limits *with* public funding to no limits at all." (Conc. opn. of Baxter, J., *ante*, at p. 724, italics in original.)

The assertion in *Taxpayers*, *supra*, 51 Cal.3d at page 760, relied on in the concurring opinion may be sound as an abstract proposition. However, it is impeached (if not demolished) by exit poll findings that are directly contrary. In an exit poll survey of voters taken during the June 7, 1988, Primary Election, the Los Angeles Times found that "[f]or the most part, people either voted for both Propositions 68 and 73, or against both. Two-thirds of the electorate voted the same way on each measure, not selectively choosing one over the other." (Los Angeles Times (June 9, 1988) p. 1, col. 4.)

It is thus reasonable to infer from exit poll data that, although a majority of the voters preferred campaign finance reform without public financing, they were almost equally prepared to accept the alternative of publicly financed reform to the result reached by the majority—no real reform at all. Perhaps the surest conclusion that one can draw is that, as we also said in *Taxpayers*, "those voters who did cast ballots for both Proposition 68 and 73 did so in an effort to ensure that one or the other . . . scheme would be adopted . . ." (51 Cal.3d at p. 761), a conclusion fortifying the view that the voters wanted campaign financing reform above all else.

Moreover, in relying on the statement quoted above from *Taxpayers*, *supra*, 51 Cal.3d at page 760, the concurring opinion ignores the bedrock on which our holding in that case stands, namely, that Propositions 68 and 73 were "competing, conflicting initiative measures which address and seek to comprehensively regulate the same subject" (51 Cal.3d at p. 770): "Both the differences . . . and the manner in which the two propositions were drafted and presented to the voters," we said, "clearly indicated that they were offered as *alternative* regulatory schemes. Each was to add a chapter 5 to title 9 of the Government Code. Each sought to add sections to that code that bore the same number, but differed in content. The ballot arguments also alerted the voters to the presentation of the two propositions as alternatives." (*Id.* at p. 754, italics added, fn. omitted.)

Last, and even more telling, as the Chief Justice, writing for the court in *Johnson* v. *Bradley, supra,* 4 Cal.4th 389, observed, there is every reason to doubt that, *standing alone,* Proposition 73's ban on the use of public funds to finance political campaigns "advances in any way the goal of enhancing the integrity of the electoral process. In fact, the opposite appears to be true. . . . [¶] . . . [¶] . . . assuming spending limitations may enhance the integrity of the electoral process, *a ban on public funding* [of political campaigns] *would actually frustrate achievement* of that goal." (4 Cal.4th at pp. 410-411, italics added.)

## III

The final barrier erected by the majority to the electorate's overwhelming desire for the reform of campaign financing is the argument that the court is somehow barred from deciding the very question we explicitly reserved in *Taxpayers, supra,* 51 Cal.3d 744. I understand the majority's reasoning to rest on the proposition that because the rule of *Taxpayers* is founded on the competing and irreconcilable nature of the measures as they were presented to the voters, we are prohibited from reassessing the relationship between the two in light of transforming postelection events, namely, the federal injunction gutting Proposition 73. To embark on such a course, the majority say, would be "unworkable," and "produce potential uncertainty" never contemplated by the framers of section 10(b).

The circumstances under which this case arises, however, are sufficiently unusual to permit us to reexamine the question of merger without endangering "settled expectations." It is conceded that Propositions 73 and 68 have been the subject of continuous litigation from virtually the day after the June 1988 Primary Election. The contribution limits of Proposition 73, its "heart and soul," have been stayed and have never gone into effect; they are now permanently enjoined from being enforced. We noted the existence of these challenges and the uncertainty of the outcome in *Taxpayers, supra,* 51 Cal.3d at page 771, footnote 13, and reserved the question of the fate of Proposition 68 should its rival prove inseverable. A federal court, we observed, "has recently restrained enforcement of the Proposition 73 restrictions on campaign contributions and transfers thereof. (*Service Employees* v. *Fair Political Practices* (E.D.Cal. 1990) 747 F.Supp. 580.)" (51 Cal.3d at p. 771, fn. 13.) Noting that the decision was not final and did not invalidate "the remainder of Proposition 73," we concluded that "we need not decide in this proceeding whether an initiative measure that has no effect at the time it is adopted because it is superseded by another measure adopted by a larger vote at the same election becomes effective if the latter is subsequently invalidated." (51 Cal.3d at p. 771, fn. 13.)

One of the members of this court wrote separately in *Taxpayers, supra,* 51 Cal.3d 744, to suggest that we were adopting "an ostrich-like approach to recent developments in the real world concerning the fate of Proposition 73" by purporting to decide the section 10(b) issue in the shadow of federal court proceedings that even then had succeeded in enjoining most of Proposition 73. (Conc. & dis. opn. of Mosk, J., 51 Cal.3d at p. 773.) The district court's injunction against enforcement of Proposition 73's campaign contribution limits has since become permanent; that judgment has been affirmed on appeal by the Ninth Circuit and the high court has denied further review; we ought now to reach the question reserved in footnote 13 of *Taxpayers* (*supra,* 51 Cal.3d 771, fn. 13).

It is settled law that "[a]s a general rule . . . a repealing clause in an invalid act is ineffective to repeal a prior valid law. This result follows whether the repealing act is void in toto . . . or declared totally void because it contains inseparable invalid provisions . . . ." (Note, *Statutory Construction: Effect Where Repealing Act Is Unconstitutional in Part* (1941) 30 Cal.L.Rev. 108, 108-109, fns. omitted; see also 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 87, p. 138.) In *Taxpayers supra,* 51 Cal.3d 744, we concluded that when conflicting competing initiatives are both approved by a majority of the voters, "only the provisions of the measure receiving the highest affirmative vote become operative upon adoption." (*Id.* at p. 770.) Reasoning by analogy, it ought to follow that where an initiative that would otherwise be operative is invalid, it cannot, in the words of section 10(b), "prevail" over a prior valid initiative, much less over one approved by a majority of the voters in the same election. Because it is reasonable to assume that a majority of the voters wanted one or the other, but not *neither* of the successful measures to prevail, any other result would run contrary to "our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise." (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 501 [286 Cal.Rptr. 283, 816 P.2d 1309]; see also *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 341 [276 Cal.Rptr. 326, 801 P.2d 1077] [describing the initiative power as "being one of the most precious rights of our democratic process"].)

Respondents evoke the spectre of a permanent legal uncertainty, of runner-up initiatives suddenly springing to life years after an election, should we hold that Proposition 68 takes effect in the wake of its invalid and inseverable rival. Although I agree that, for prudential reasons, a declaration of unconstitutionality in response to a challenge brought many years after

voter approval of an initiative should not invariably result in the revival of provisions of a competing initiative that the voters simultaneously approved, especially if retroactive revival threatens vested rights or firmly rooted expectations, that threat is insubstantial under the circumstances present here. Far more troubling is the reality at hand, where it appears that, entirely as a result of uninterrupted litigation challenges to the validity of the campaign finance reform initiatives, the voters, a clear majority of whom signaled a desire for reform, will be denied the very substance of reform.

Had the federal district court judgment become final only a few months earlier than it did, can anyone suppose that we would have decided *Taxpayers* as we did? Yet the majority now decline to examine one of the most important issues affecting the political health of the state in the last 20 years simply because our decision in *Taxpayers*, *supra*, 51 Cal.3d 744, became final before the federal judgment. I cannot subscribe to a result that, with due respect to the majority, makes a judgment of this court appear so at odds with the palpable desires of the voters and events in the "real world."[3]

## CONCLUSION

I would, in sum, hold that no provision of Proposition 73 is severable from the measure's campaign contribution limits that have been permanently enjoined by the federal courts and that, under the circumstances presented by this case, the complete nullification of Proposition 73 means that Proposition 68, the rival campaign finance reform measure approved by the voters at the June 1988 election, "prevails."

It is anomalous that both sides of the political aisle join in this successful effort to thwart the will of the people they serve. Although their fear of reform has been temporarily assuaged, they shall bear the unpropitious

---

[3](Parenthetically, one can only wonder why the drafters of Proposition 73—who appear in this litigation as amici curiae—or some other partisan of campaign finance reform has not asked this court itself to "reform" or construe the fiscal year provisions of the initiative that the federal courts have found do not pass constitutional muster. The issues underlying the First Amendment concerns that led the Ninth Circuit to nullify the bulk of Proposition 73 are, after all, matters of state rather than federal law. Under our precedents, they are arguably susceptible to a construction by the state's highest court that repairs any constitutional infirmity. [See, e.g., *Arp* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 407 [138 Cal.Rptr. 293, 563 P.2d 849]; *Del Monte* v. *Wilson* (1992) 1 Cal.4th 1009, 1026 [4 Cal.Rptr.2d 826, 824 P.2d 632]; cf. *Welsh* v. *United States* (1970) 398 U.S. 333, 361 [26 L.Ed.2d 308, 330-331, 90 S.Ct. 1792] (Harlan, J., conc.); Ginsburg, *Some Thoughts on Judicial Authority to Repair Unconstitutional Legislation* (1979) 23 Clev.St.L.Rev. 301, 310-312.])

consequences of tomorrow. The popular will of the electorate will not long be denied. I dissent.

Mosk, J., and Kennard, J., concurred.